**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MARIANO LOMBARDI, derivatively on behalf of MATTEL, INC., | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| CHRISTOPHER A. SINCLAIR, RICHARD L. DICKSON, KEVIN M. FARR, JOSEPH B. JOHNSON, MARGARET H. GEORGIADIS, MICHAEL J. DOLAN, TREVOR A. EDWARDS, FRANCES D. FERGUSSON, ANN LEWNES, DOMINIC NG, VASANT M. PRABHU, DEAN A. SCARBOROUGH, DIRK VAN DE PUT, and KATHY W. LOYD, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MATTEL, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Mariano Lombardi ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Mattel, Inc. ("Mattel" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Christopher A. Sinclair, Richard L. Dickson, Kevin M. Farr, Joseph B. Johnson, Margaret H. Georgiadis, Michael J. Dolan, Trevor A. Edwards, Frances D. Fergusson, Ann Lewnes, Dominic Ng, Vasant M. Prabhu, Dean A. Scarborough, Dirk Van de Put, and Kathy W. Loyd (collectively, the "Individual Defendants" and together with Mattel, the "Defendants") for breaches of their fiduciary duties as directors and/or

officers of Mattel, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mattel, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Mattel's directors and officers starting on October 19, 2016 and through the present (the "Relevant Period").

2.     Mattel is a company that designs, manufactures, and markets toy products worldwide which are sold to its retail customers and directly to consumers.  The Company's portfolio of brands and products are divided into major brand categories, and include popular brands such as Barbie® fashion dolls and Hot Wheels®.  The Company "believes its products are among the most widely recognized toy products in the world."

3.     During the third and fourth fiscal quarters ended September 30, 2016 and December 31, 2016, respectively, in an attempt to artificially inflate its revenue, the Company loaded its retail customers with excess product in advance of the holiday selling season.

4.      In order to entice its retailers to take on the excess inventory, the Company issued large amounts of "sales adjustments," such as trade discounts and other allowances, and increased promotional spending in order to assist its retailers.  Mattel even offered to accept later returns of excess products.  Such sales adjustments and promotional costs had a material adverse effect on the Company's operating results for the fourth fiscal quarter ended December 31, 2016, and continued into the following fiscal quarter.

5.      On January 25, 2017, the Company announced its disappointing operating results for the fourth fiscal quarter 2016.

6.      On this news, the price per share of Mattel stock fell $5.57, or approximately 18%, from the previous day's closing price to close at $25.99 per share on January 26, 2017.

7.      Mattel's overall disappointing results were caused by the Company's considerable sales adjustments issued and promotional costs incurred during the third and fourth fiscal quarters to create a massive, previously undisclosed—yet known to the Individual Defendants—build-up of the Company's inventory in its retail channel for the purpose of recording as much revenue as possible for the 2016 holiday season.

8.      Although the Individual Defendants slowly began to reveal issues with the Company's inventory in its retail channel on January 25, 2017, the truth did not fully emerge until April 20, 2017 when the Company issued a press release and held an earnings conference call reporting further disappointing results and revealing that the Company's issues with regard to the inventory in its retail channel were far more significant than had been portrayed to the investing public.

9.      On this news, the price per share of Mattel stock fell $3.42, or approximately 14%, from the previous day's closing price to close at $21.79 per share on April 21, 2017.

10.     During the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; (5) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; and (6) Mattel failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact.

11.     The Individual Defendants also breached their fiduciary duties by wasting the Company's corporate assets through channel stuffing.

12. Moreover, in breach of their fiduciary duties the Individual Defendants failed to maintain internal controls.

13. Due to the artificial inflation of the Company's stock price caused by the foregoing misrepresentations, for the repurchases of the Company's own stock during the Relevant Period before the fraud was exposed, which repurchases were caused by the Individual Defendants, the Company paid over $471,461 more than the stock was worth. Moreover, one of the Individual Defendants sold $277,110 worth of Company stock on material inside information while the Company's stock price was artificially inflated.

14. In light of the Individual Defendants' misconduct, which has subjected the Company, its former Chief Executive Officer ("CEO"), its Chief Operating Officer ("COO"), its former Chief Financial Officer ("CFO"), and its Senior Vice President and Corporate Controller to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, including through overpayment for stock through repurchases, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's former CEO, its COO, its former CFO, and its Senior Vice President and Corporate Controller's liability in the Securities Class Action, their being beholden to each other, their longstanding business and

personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Mattel's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.      Venue is proper in this District because Mattel is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

20.      Plaintiff is a current shareholder of Mattel.  Plaintiff purchased Mattel common stock during the beginning of the Relevant Period and has continuously held Mattel common stock at all relevant times.

**Nominal Defendant Mattel**

21.     Mattel is a Delaware corporation with its principal executive offices at 333 Continental Boulevard, El Segundo, California 90245.  Mattel's shares trade on the NASDAQ under the ticker symbol "MAT."

**Defendant Sinclair**

22.     Defendant Christopher A. Sinclair ("Sinclair") has served as the Executive Chairman of the Board since February 2017, Chairman of the Board since January 2015, and as a Company director since 1996.  He formerly served as the Company's CEO from April 2015 to February 2017, at which point he resigned from his position and took on the role of Executive Chairman of the Board.  According to the Company's Schedule 14A filed with the SEC on April 5, 2017 (the "2017 Proxy Statement), as of March 24, 2017, Defendant Sinclair beneficially owned 1,649,991 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Sinclair owned over $41.5 million worth of Mattel stock.

23.     For the fiscal year ended December 31, 2016, Defendant Sinclair received $9,225,193 in compensation from the Company.  This included $1,500,000 in salary, $4,452,008 in stock awards, $2,333,333 in option awards, and $939,852 in all other compensation.

24.     The Company's 2017 Proxy Statement stated the following about Defendant Sinclair:

> Mr. Sinclair brings to Mattel's Board invaluable leadership, finance and strategic experience across a variety of industries and complex organizations, and, during his tenure as a director and CEO of Mattel, he has gained a deep understanding of Mattel's business, the toy industry and its cycles. He was responsible for building Pepsi-Cola's international business, and, as a result, he also brings substantial global business experience to Mattel's Board. As a former Chief Executive Officer of a large multinational, multibrand consumer products company like Pepsi-Cola, Mr. Sinclair also gained front-line exposure to many of the issues facing a public company like Mattel, particularly on the operational, financial and corporate

governance fronts. As noted above, Mr. Sinclair also has extensive board experience, having served on the boards of numerous companies, including a number of emerging market growth ventures such as The Water Initiative and Biovittoria, Ltd.

**Defendant Dickson**

25.    Defendant Richard L. Dickson ("Dickson") has served as the Company's President and COO since April 2015.  He previously served as the Company's President, Chief Brands Officer from January 2015 to April 2015.  According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Dickson beneficially owned 604,920 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Dickson owned over $15.2 million worth of Mattel stock.

26.    For the fiscal year ended December 31, 2016, Defendant Dickson received $4,287,699 in compensation from the Company.  This included $900,000 in salary, $2,274,381 in stock awards, $1,000,000 in option awards, and $113,318 in all other compensation.

27.    The Company's 2017 Proxy Statement stated the following about Defendant Dickson:

> **Mr. Dickson**[1] has been President and Chief Operating Officer since April 2015. From January 2015 to April 2015, he served as President, Chief Brands Officer. He served as Chief Brands Officer from May 2014 to January 2015. From February 2010 to May 2014, he served as President and CEO of Branded Businesses at The Jones Group, Inc. From August 2008 to February 2010, he served as General Manager and Senior Vice President of the Barbie Brand at Mattel. From 2000 to 2008, he was Senior Vice President at Mattel overseeing Consumer Products, Marketing, Media, Entertainment and Packaging. Prior to Mattel, he served as Vice President of Brand Management and Merchandising at Estee Lauder Companies, Inc. and was Principal with Gloss.com, an e-commerce beauty website he helped develop and manage until its acquisition by Estee Lauder. Mr. Dickson started his career and spent nearly a decade with Bloomingdale's, a leading U.S. fashion retailer.

---

[1] Throughout this Complaint, emphasis is contained in the original unless otherwise noted.

**Defendant Farr**

28.     Defendant Kevin M. Farr ("Farr") served as the Company's CFO from February 2000 to September 2017.  According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Farr beneficially owned 1,107,811 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Farr owned over $27.8 million worth of Mattel stock.

29.     For the fiscal year ended December 31, 2016, Defendant Farr received $3,551,753 in compensation from the Company.  This included $750,000 in salary, $1,650,490 in stock awards, $585,000 in option awards, and $122,139 in all other compensation.

30.     The Company's 2017 Proxy Statement stated the following about Defendant Farr:

**Mr. Farr** has been Chief Financial Officer since February 2000. From September 1996 to February 2000, he was Senior Vice President and Corporate Controller. From June 1993 to September 1996, he served as Vice President, Tax. Prior to that, he served as Senior Director, Tax from August 1992 to June 1993.

**Defendant Johnson**

31.     Defendant Joseph B. Johnson ("Johnson") has served as the Company's Senior Vice President and Corporate Controller since May 2015.  The Company's May 4, 2015 press release announcing his appointment stated the following about Defendant Johnson:

Mr. Johnson, age 52, joins Mattel from Chiquita Brands International, Inc., a leading global marketer and distributor of food products, where he served as Vice President, Chief Accounting Officer & Treasurer. Previously, Mr. Johnson held a number of leadership roles with Resolute Forest Products, an international wood and paper products company, including Senior Vice President, Finance and Chief Accounting Officer, Vice President and Corporate Controller and Director of Financial Reporting. Earlier in his career, Mr. Johnson spent nearly 14 years at Ernst & Young LLP. A certified public accountant, Mr. Johnson holds a bachelor's degree in business administration with an emphasis in accounting from the University of North Florida.

**Defendant Georgiadis**

32.    Defendant Margaret H. Georgiadis ("Georgiadis") has served as the Company's CEO since February 2017.  She also serves as a member of the Equity Grant Allocation Committee. According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Georgiadis beneficially owned 107,718 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Georgiadis owned over $2.7 million worth of Mattel stock

33.    Per the 2017 Proxy Statement, the Company's Compensation Committee approved an annual target compensation package that consists of a base salary of $1,500,000, a target bonus opportunity of 150% of her base salary, with a minimum bonus of $1,500,000 for fiscal 2017, and a 2017 equity long-term incentives annual target grant value of $8,250,000, to be divided equally into three-year performance units, restricted stock units ("RSUs") and stock options.  Defendant Georgiadis is also entitled to extensive stock grants.  As noted in the 2017 Proxy Statement:

> On February 8, 2017, in recognition of the value of equity compensation forfeited by Ms. Georgiadis when she resigned from Google, she received a make-whole grant of RSUs, determined by dividing $14,000,000 by the average of the closing trading prices of Mattel common stock over the 20 consecutive trading days immediately prior to the grant date ("Average Price"). These RSUs vest in twelve monthly installments following the grant date. To establish an immediate and meaningful link to Mattel's long-term stock performance, the Compensation Committee also made new hire grants of RSUs and stock options to Ms. Georgiadis on February 8, 2017. The RSU grant was determined by dividing $5,500,000 by the Average Price, and the stock option grant was determined by dividing $5,500,000 by a Black-Scholes value based on the Average Price. These new-hire grants vest 50% on each of the second anniversary and third anniversary of the grant date.

34.    The Company's 2017 Proxy Statement stated the following about Defendant Georgiadis:

> Ms. Georgiadis brings to Mattel's Board significant experience in technology, marketing, consumer insights, e-commerce, finance, leadership, global business,

strategy and business development. She has proven ability to foster innovation, experience in building partnerships on a global scale and expertise in leading complex organizations and in engaging consumers and retail partners in a rapidly evolving industry. She has successfully led efforts to deliver above market growth and profitability by creating transformational partnerships across content, media and technology providers and through innovation in product development and customer engagement. At Google, Ms. Georgiadis led their commercial operations and advertising sales in the U.S., Canada and Latin America and was responsible for driving Google's sales operations and strategies across regions, channels and products. She also has over 15 years of analytical and strategic experience at the global management consulting firm of McKinsey & Company.

**Defendant Dolan**

35.     Defendant Michael J. Dolan ("Dolan") has served as the Board's Independent Lead Director since January 2015 and as a Company director since 2004.  He also serves as Chair of the Compensation Committee, Chair of the Executive Committee, and as a member of the Governance and Social Responsibility Committee.  According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Dolan beneficially owned 104,943 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Dolan owned over $2.6 million worth of Mattel stock.

36.     For the fiscal year ended December 31, 2016, Defendant Dolan received $330,002 in compensation from the Company.  This included $165,000 in fees earned or cash paid, $140,002 in stock awards, and $25,000 in all other compensation.

37.     The Company's 2017 Proxy Statement stated the following about Defendant Dolan:

As a currently-serving Chief Executive Officer of a large global company, Mr. Dolan brings to Mattel's Board leadership, finance, global consumer products and branding, strategic marketing and operations experience. Mr. Dolan also brings a valuable perspective on the entertainment industry through his experience as the former Chief Executive Officer of IMG, which is important to Mattel since many of our most popular toys are derived from licensed entertainment properties. Also, Mr. Dolan's long tenure with Young & Rubicam enables him to provide unique insights into brand building and advertising. Mr. Dolan has also gained valuable experience as the Chief Financial Officer of IMG, Viacom and Young & Rubicam, where he dealt with complex accounting principles and judgments, internal

controls, financial reporting rules and regulations, and evaluated the financial results and financial reporting processes of large companies.

**Defendant Edwards**

38.    Defendant Trevor A. Edwards ("Edwards") has served as a Company director since 2012.  He also serves as a member of the Compensation Committee and as a member of the Governance and Social Responsibility Committee.  According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Edwards beneficially owned 10,400 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Edwards owned $261,664 worth of Mattel stock.

39.    For the fiscal year ended December 31, 2016, Defendant Edwards received $266,002 worth of compensation from the Company.  This included $100,000 in fees earned or cash paid, $140,002 in stock awards, and $26,000 in all other compensation.

40.    The Company's 2017 Proxy Statement stated the following about Defendant Edwards:

> Mr. Edwards brings to Mattel's Board two decades of marketing and global brand management experience from a large public company. His leadership and strategy skills in overseeing category business units globally and all brand management functions, including digital and advertising, sports marketing, brand design, public relations and retail marketing, provide a unique perspective on Mattel's key goals and strategies for growth. During his career at NIKE, Mr. Edwards has led some of the brand's most significant break-through innovations, including spearheading the creation of NIKE+. In addition, he helped transform the digital landscape and position NIKE as a leader in the use of social media to connect with consumers globally.

**Defendant Fergusson**

41.    Defendant Frances D. Fergusson ("Fergusson") has served as a Company director since 2006.  He also serves as a member of the Executive Committee, as a member of the Finance Committee, and as Chair of the Governance and Social Responsibility Committee.  According to

the 2017 Proxy Statement, as of March 24, 2017, Defendant Fergusson beneficially owned 31,325 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Fergusson owned $788,137 worth of Mattel stock.

42.    For the fiscal year ended December 31, 2016, Defendant Fergusson received $275,902 in compensation from the Company.  This included $115,000 in fees earned or cash paid, $140,002 in stock awards, and $20,900 in all other compensation.

43.    The Company's 2017 Proxy Statement stated the following about Defendant Fergusson:

> As the former President of a major educational institution for 20 years, Dr. Fergusson brings to Mattel's Board her extensive general and financial management, leadership and strategic planning experience. At Vassar College, she headed strategic planning projects and strengthened the College's financial position. Dr. Fergusson also brings her experience serving on Boards of large, public companies and for-profit entities. Her service and leadership role with many non-profit entities also provide a unique perspective to the Board.

**Defendant Lewnes**

44.    Defendant Ann Lewnes ("Lewnes") has served as a Company director since 2015. She also serves as a member of the Governance and Social Responsibility Committee.

45.    For the fiscal year ended December 31, 2016, Defendant Lewnes received $255,002 in compensation from the Company.  This included $100,00 in fees earned or cash paid, $140,002 in stock awards, and $15,000 in all other compensation.

46.    The Company's 2017 Proxy Statement stated the following about Defendant Lewnes:

> As a global media and marketing leader in the technology industry, Ms. Lewnes brings to Mattel's Board her strong leadership in branding, advertising, technology and financial management marketing. She also brings experience in driving strategic growth and global demand at two public technology companies, as well

as her experience serving on the boards of nonprofit entities. At Adobe, Ms. Lewnes is responsible for Adobe's corporate brand, corporate communications and integrated marketing efforts worldwide and has spearheaded the transformation of the company's global marketing efforts to be digital-first and data-driven. At Intel, Ms. Lewnes played a key role globally positioning the business and products to consumers, business professionals and key computer channels.

**Defendant Ng**

47.     Defendant Dominic Ng ("Ng") has served as a Company director since 2006.  He also serves as a member of the Audit Committee and as a member of the Finance Committee. According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Ng beneficially owned 9,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Ng owned $239,020 worth of Mattel stock.

48.     For the fiscal year ended December 31, 2016, Defendant Ng received $280,002 in compensation from the Company.  This included $110,000 in fees earned or cash paid, $140,002 in stock awards, and $30,000 in all other compensation.

49.     The Company's 2017 Proxy Statement stated the following about Defendant Ng:

As a currently-serving Chief Executive Officer of a large California commercial bank, Mr. Ng brings to Mattel's Board significant experience in leadership, strategy, business development and global business. He also has valuable experience in dealing with complex accounting principles and judgments, internal controls, financial reporting rules and regulations, and evaluating financial results and financial reporting processes of large companies. Mr. Ng transformed East West Bank from a small savings and loan association based in Los Angeles into a large full service commercial bank with exclusive focus on the United States and Greater China markets. Mr. Ng's extensive experience conducting business in China is extremely valuable to Mattel because of Mattel's large manufacturing presence in China and emerging markets initiatives (including China). He also brings to Mattel's Board extensive business and governmental connections in the State of California and the greater city of Los Angeles, where Mattel is headquartered.

50.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Ng made the following sale of Company stock (and made no purchases of Company stock).  On November 21, 2016, Defendant Ng sold 9,000 shares of Company stock for $30.79 per share, for which he received $277,110.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the fraud.

**Defendant Prabhu**

51.     Defendant Vasant M. Prabhu ("Prabhu") has served as a Company director since 2007.  He also serves as Chair of the Audit Committee, and as a member of the Executive Committee and as a member of the Finance Committee.  According to the 2017 Proxy Statement, as of March 24, 2016, Defendant Prabhu beneficially owned 29,325 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Prabhu owned $737,817 worth of Mattel stock.

52.     For the fiscal year ended December 31, 2016, Defendant Prabhu received $300,002 in compensation from the Company.  This included $130,000 in fees earned or cash paid, $140,002 in stock awards, and $30,000 in all other compensation.

53.     The Company's 2017 Proxy Statement stated the following about Defendant Prabhu:

> As Chief Financial Officer of a number of large public companies, Mr. Prabhu brings to Mattel's Board extensive leadership experience dealing with complex accounting principles and judgments, internal controls, financial reporting rules and regulations, and evaluating financial results and financial reporting processes of large companies. As Senior Vice President Finance & Chief Financial Officer of Pepsi International, Mr. Prabhu was responsible for the company's franchise and had oversight of operations in more than 100 countries. His global management,

retail and finance experience are also important to Mattel, given Mattel's significant international operations.

**Defendant Scarborough**

54.     Defendant Dean A. Scarborough ("Scarborough") has served as a Company director since 2007. He also serves as a member of the Compensation Committee, as a member of the Executive Committee, and as Chair of the Finance Committee. According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Scarborough beneficially owned 35,073 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Scarborough owned over $882,436 worth of Mattel stock.

55.     For the fiscal year ended December 31, 2016, Defendant Scarborough received $262,502 in compensation from the Company. This included $115,000 in fees earned or cash paid, $140,002 in stock awards, and $7,500 in all other compensation.

56.     The Company's 2017 Proxy Statement stated the following about Defendant Scarborough:

> As a currently-serving Executive Chairman and former Chief Executive Officer of a large public company, Mr. Scarborough brings to Mattel's Board deep leadership, brand building, strategy, business development, finance, global consumer products and operations experience. He has extensive experience in retail and distribution channels, enabling Mr. Scarborough to provide valuable perspective and insights in these areas.

**Defendant Van de Put**

57.     Defendant Dirk Van de Put ("Van de Put") served as a Company director from 2011 through November 17, 2017, when he resigned. He also served as a member of the Audit Committee and as a member of the Governance and Social Responsibility Committee. According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Van de Put beneficially owned

13,133 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Van de Put owned over $330,426 worth of Mattel stock.

58.     For the fiscal year ended December 31, 2016, Defendant Van de Put received $250,002 in compensation from the Company.  This included $110,000 in fees earned or cash paid and $140,002 in stock awards.

59.     The Company's 2017 Proxy Statement stated the following about Defendant Van de Put:

> As a currently-serving President and Chief Executive Officer of a large, multinational corporation, Mr. Van de Put brings to Mattel's Board invaluable leadership, finance, international, strategy, business development, global retail and operations experience. Mr. Van de Put contributes extensive and diversified management experience in large public and private companies in the global consumer products and consumer packaged goods industries.

**Defendant Loyd**

60.     Defendant Kathy W. Loyd ("Loyd") has served as a Company director since 2001. She also serves as a member of the Audit Committee and as a member of the Compensation Committee.  According to the 2017 Proxy Statement, as of March 24, 2017, Defendant Loyd beneficially owned 11,401 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 24, 2017 was $25.16, Loyd owned over $286,849 worth of Mattel stock.

61.     For the fiscal year ended December 31, 2016, Defendant Loyd received $280,002 in compensation from the Company.  This included $110,000 in fees earned or cash paid, $140,002 in stock awards, and $30,000 in all other compensation.

62.     The Company's 2017 Proxy Statement stated the following about Defendant Loyd:

Given her experience as a professor of information technology, Chief Information Officer and an information management leader, Ms. White Loyd brings to Mattel's Board unique insights into the strategic use of information technology as a competitive advantage. Such experience as well as her public company director experience with a software provider make Ms. White Loyd an important contributor as information technology is an ever increasing important focus for Mattel.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63.     By reason of their positions as officers, directors, and/or fiduciaries of Mattel and because of their ability to control the business and corporate affairs of Mattel, the Individual Defendants owed Mattel and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Mattel in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Mattel and its shareholders so as to benefit all shareholders equally.

64.     Each director and officer of the Company owes to Mattel and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Mattel, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.     To discharge their duties, the officers and directors of Mattel were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Mattel, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Mattel's Board at all relevant times.

68.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

69.    To discharge their duties, the officers and directors of Mattel were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Mattel were required to, among other things:

      (a)    ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Mattel's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Mattel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Mattel and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Mattel's operations would comply with all applicable laws and Mattel's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Individual Defendants further owed to Mattel and the shareholders the duty of loyalty requiring that each favor Mattel's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Mattel and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, and directorial positions with Mattel, each of the Individual Defendants had access to adverse, non-public information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Mattel.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock and one of the Individual Defendants engaged in insider sales.

76.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Mattel was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Mattel, and was at all times acting within the course and scope of such agency.

## MATTEL'S CODE OF CONDUCT

79.     Pursuant to the Company's Code of Conduct, all employees are expected to comply

with the Code of Conduct, Company policies, and laws that govern the Company's activities.

Additionally, certain of the provisions of the Code of Conduct apply to members of the Board.

80.     The Code of Conduct provides, as to "Conflict of Interest," that:

A conflict of interest arises any time our personal interests might affect our
judgment as to what is in the best interest of Mattel, or make it difficult to perform
our work for Mattel objectively and effectively. Employees and Directors must act
in the best interests of Mattel, without considering personal interests or the potential
for personal benefit.

It is the responsibility of each Covered Employee to promptly bring to the attention
of the Company's Disclosure Committee any material information of which the
executive may become aware that affects the disclosures made by the Company in
its public filings or otherwise, and otherwise to assist the Disclosure Committee in
fulfilling its responsibilities. In addition, each Covered Employee shall promptly
bring to the attention of the Disclosure Committee and the Internal Audit function,
any information the employee may have concerning (a) deficiencies or weaknesses
in the design or operation of internal controls which could adversely affect the
Company's ability to record, process, summarize and report financial information
or (b) any fraud, whether or not material, that involves management or other
employees who have a significant role in the Company's financial reporting,
disclosures or internal controls.

81.     The Code of Conduct provides, as to "Protecting Mattel's Assets," that:

All employees and Directors share in the responsibility to protect Mattel's assets
(including physical assets, financial assets, intellectual property and confidential
information) from theft, loss, damage, misuse or waste. Employees who use
company property, such as vehicles and laptop computers, should take appropriate
measures to ensure their proper security and use. Company assets should not be
used for illegal purposes, or for personal benefit (except as may be allowed in
companyapproved compensation arrangements). Incidental personal use of
company assets, such as telephones, personal computers and photocopying
machines, is permitted as long as such use does not interfere with the employee's
duties, is not done for monetary gain, does not conflict with Mattel's business and
does not violate any Mattel Policy or applicable law.

82.     The Code of Conduct provides, as to "Insider Information and Securities Trading,"

that:

All non-public information about Mattel and about Mattel's business partners obtained in the course of our work at Mattel should be considered confidential information. Employees and Directors are not permitted to use or share confidential information for purposes of trading securities of Mattel or any other company, or for any other purpose except conducting Mattel's business. To use such information for personal financial benefit or to "tip" others who might do so is not only unethical, but also illegal. Employees and Directors should be familiar with and follow Mattel's Insider Trading Policy, and should contact the Law Department with any questions.

83.     The Code of Conduct provides, as to "Accuracy of Company Records, Public Reports and Communications," that:

Mattel is committed to provide full, fair, complete, accurate, timely and understandable disclosure of information, including financial information, in reports filed with the Securities and Exchange Commission and in other public communications, in accordance with applicable laws, rules and regulations.

Financial books, records and accounts must be maintained in reasonable detail, accurately reflect transactions and events, and conform to applicable legal and accounting requirements and to Mattel's system of internal controls. In order to fulfill our responsibility for sound decision-making, we require honest and accurate recording and reporting of business information and transactions, including quality, safety and personnel data records, as well as financial transactions and records.

Falsification of any record or financial report, such as quality and safety data, time reports or expense reports, will result in immediate disciplinary action.

See the "How to Get Help and Raise Concerns" section for information about procedures for raising concerns about accounting and auditing matters.

84.     The Code of Conduct provides, as to "Our Responsibility to Government and Compliance with the Law," that:

Employees and Directors must comply with the laws, rules and regulations wherever Mattel does business.

Every employee has a responsibility to understand the law and the Code as it applies to his or her job. Any employee who has a question or concern about the legality of an action should contact the Law Department for advice.

**Which Law Applies?**

Mattel, Inc. is incorporated in the United States. The laws of the United States often extend to Mattel's operations throughout the world, and to the business activities of Mattel's employees wherever we live and work.

As a global company, Mattel's operations may be regulated by many different laws at the same time. There may be a conflict between the applicable laws of two or more countries. Any employee who thinks there may be a conflict should ask the Law Department for advice.

The Code of Conduct is intended to promote compliance with the laws and regulations that apply to Mattel's business. However, if we find that compliance with the Code of Conduct might cause us to violate the law, we must obey the law and ask the Law Department for advice as soon as possible. On the other hand, if following any local business custom or practice would cause us to violate the Code of Conduct, we must comply with the Code of Conduct and notify our supervisors of the conflict.

85.     The Code of Conduct provides, as to "Taking Action to Correct Problems," that:

Taking action to correct problems is part of the Mattel culture.

Mattel provides a number of resources that employees can use to raise ethical concerns or report potential violations. If you observe conduct that you believe may be unethical, illegal or in violation of the Code of Conduct or Company Policies, you should report your concerns to your supervisor, the Human Resources Department, the Law Department, the Internal Audit Department, the Global Security Department or the confidential EthicsLine.

All reported concerns will be handled promptly, fairly and discreetly. Employees must cooperate fully with any investigation that Mattel undertakes and must answer truthfully any questions that are asked as part of the investigation.

86.     The Code of Conduct provides, as to "Raising Concerns or Complaints About

Accounting or Auditing Matters," that:

Any employee may submit a good faith concern or complaint regarding accounting, internal accounting controls or auditing matters to Mattel, without fear of retaliation of any kind, in any of the following ways (these are general complaint procedures and may vary from country to country due to local laws and regulations):
- Contact an Officer: Employees with complaints regarding accounting, internal accounting controls or auditing matters may report their complaints to the General Counsel or Vice President – Audit, in writing, by phone or via e-mail.

- Employee complaints submitted in writing or by telephone may be made on a confidential and anonymous basis. Due to technical constraints, e-mail submissions may not be made anonymously.
- Call the EthicsLine: Mattel's EthicsLine permits employees to report complaints regarding accounting, internal accounting controls or auditing matters and other matters confidentially and anonymously.

87.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.   Moreover, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, maintain the "accuracy of company records, public reports and communications," and uphold the employee and director responsibilities related thereto.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

88.     Mattel is a Company that designs, manufactures, and markets toy products worldwide, which are sold to Mattel's customers and directly to consumers.   The Company's portfolio of brands and products are divided into four major brand categories: (1) Mattel Girls & Boys Brands (including popular brands such as Barbie® fashion dolls and Hot Wheels®); (2) Fisher-Price Brands (including popular brands such as Thomas & Friends® and Mickey Mouse®); (3) American Girl Brands; and (4) Construction and Arts & Crafts Brands.   The Company "believes its products are among the most widely recognized toy products in the world."

89.     The Company's operating segments, which are separately managed business units, consist of: (1) North America; (2) International; and (3) American Girl.   A relatively small retail

customer base accounts for a majority of the Company's products sales.  In fact, direct sales to United States and Canadian retailers account for approximately half of the Company's gross revenue.  Wal-Mart Stores, Inc., Target Corporation, and Toys "R" Us, Inc. collectively accounted for approximately 39% of Mattel's net revenue in the fiscal year ended December 31, 2016.  The majority of Mattel's retail sales occur between September and December.

90.     In the years leading up the beginning of the Relevant Period, the Company was underperforming its peers, and in 2015, its operating profit margin declined nearly 50% to 9.5% due, in large part, to deteriorating sales and gross margins, higher promotional spending levels, and the Company's products failing to resonate with its customer base.  The Company was thus in the midst of an attempted turnaround upon entering the Relevant Period, and such efforts to improve the Company continued.

91.     During the Relevant Period, as set forth herein, securities analysts would inquire into the extent to which the Company's retail channel was supplied with inventory by asking certain of the Individual Defendants questions regarding retailer point-of-sale ("POS") data and product shipments to retailers.  Comparison of these metrics would allow investors to better determine whether the Company's inventory in its retail channel was decreasing, increasing, or remaining steady.  Thus, statements made by the Individual Defendants that retailer POS data and shipments to retailers were "aligned," or balanced, falsely portrayed that the Company's retail channel inventory was not increasing.

92.     As noted herein, Mattel's retailers were, in fact, overloaded with the Company's products, and shipments of the Company's products to its retailers far exceeded retailer POS data.

**Former Employees' Statements Show Individual Defendants' Awareness of the
Scheme to Engage in Channel Stuffing and Make False and Misleading Statements**

93.     FE1 served as a Senior Vice President of Global Brands for Mattel from October 2014 through October 2016, and was responsible for developing marketing strategies, product lines, and distribution plans for many of the Company's brands.[2]  FE1 worked in the Company's New York City offices.   For each brand, FE1 would develop a "tool kit" and coordinate with Company employees in different regions to help them in developing a strategy for selling and promoting brands in the employees' respective markets.   FE1 would routinely speak with representatives of the Company's major retailers in the course of his employment to inquire about margins, retail sales, promotional activities, and margins.  The Company's top retailers included Amazon, Toys "R" Us, Wal-Mart, and Target.   While employed with the Company, FE1 had several conversations with the Company's sales team, including several meetings every year attended by the Company's sales team and led by Totzke to discuss current year sales and expectations and strategies for sales in the future.  FE1 reported to the Executive Vice President of Fischer Price, who in turn reported to Defendant Dickson, who in turn reported to Defendant Sinclair.

94.     Soon after joining the Company, FE1 analyzed the Company's marketing plans, and concluded that the Company failed to execute its marketing plans, which resulted in Mattel selling too much product to its retailers to meet sales targets.  The Company's retailers would then demand concessions to help them meet their targeted profit margins.  According to FE1, the Company became caught in a cycle of "robbing Peter to Pay Paul," hurting the Company's brands.

---

[2] Anonymous witnesses are identified herein with the designation "FE1," "FE2," etc., and all such references to anonymous witnesses or employees are drawn from the Consolidated Complaint for Violations of the Federal Securities Laws filed in the Securities Class Action on November 28, 2017, which is attached as Exhibit A hereto, and correspond to the same witnesses referenced therein.

During a conversation in El Segundo, California in January 2015, FE1 presented his analysis and findings to Defendant Carr, who seemed surprised by FE1's presentation and asked who was directing the Company's failed strategy which trapped it in a cycle that undercut its own brands. FE1 replied, "It's your finance team!"

95.     The following years, the Company continued its practice of over-selling to retailers.  Per FE1, the Company had become trapped in a cycle of channel stuffing ever since Mattel's high margin fashion doll product line began falling apart in 2014 and 2015.  Such dolls, per FE1, offered twice the margin of other Company products, meaning that the Company had to double the sales of its other products for every fashion doll sale lost by the Company.

96.     In 2014, according to FE1, the Company learned that its license for Disney Princess fashion dolls would be lost to Hasbro, Mattel's competitor.  The Disney Princess license was lost by 2015 and the Company's Frozen fashion dolls sales began a dramatic decline, per FE1.  Monster High, another of the Company's fashion doll brands, also was on the decline.  Per FE1, in order to make up for the lost fashion doll sales, the Company shipped products to retailers and gave them various kinds of concessions to take on the excess inventory and aid the Company in meeting end-of-year financial targets.

97.     The concessions given by the Company, per FE1, including dropping certain terms, cutting prices, and allowing retailers to buy products on a direct import basis.  To make up for declining sales in the Company's high margin fashion doll business, the Company provided concessions at "bigger and bigger scale" over time and over-shipped products.  However, per FE1, the Company had to "pay the devil in January."  According to FE1, the Company over-shipped all its products, not just one or a few product lines.

98.     In January 2016, FE1 attended a conference in Hong Kong with much of the Company's sales team.  FE1 heard from Company salespeople during the conference that the Company hit its sales targets for 2015 by loading retailers with inventory for which it would ultimately have to provide concessions.

99.     The Company's senior management, including at least Defendants Sinclair, Dickson, Farr, and Johnson, were aware of the Company's practice of over-selling to retailers and subsequently providing concessions to them when inventory did not sell.  For instance, according to FE1, in spring of 2015 when Defendant Sinclair became CEO, he asked for a monthly report on the health of all of the Company's brands, which included financials drawn from monthly and weekly point-of-sale reports.  The reports were compiled by the Company's market research group with the assistance of FE1, the Executive Vice President of Fischer Price Jean McKenzie, the former Senior Vice President of Global Brands Lisa Mancuso, other global brand heads, and various analysts and sales professionals.  Per FE1, before the reports could be delivered to Defendant Sinclair, they had to be signed off each month by all of the Company's brand teams.  In response to the steadily declining sales shown in the reports, according to FE1, Defendant Sinclair held numerous meetings with employees working on the Company's fashion doll brands.

100.    Senior employees of the Company could also access product sales information in ways other than the monthly reports.  Monthly and weekly point-of-sale reports noted sales trends and retailer-level inventory levels, according to FE1.  FE1 stated that, "We watch it every week," and, "We kn[e]w precisely how much inventory is in every retailer."  The monthly and weekly point-of-sale reports, per FE1, noted increasingly bloated inventories and disappointing sales at retailers during 2016.

101.    According to FE1, the Company asked its executive vice presidents in 2015 to develop a plan for high-margin fashion dolls sales that were lost, and because of the declining fashion doll sales, the Company set lower 2015 financial targets.  However, per FE1, the Company set financial targets in 2016 that were not possible to reach without over-shipping products to its retailers.  According to FE1, the plan to meet the 2016 sales targets simply made no sense.  Around September 2015, FE1 recalls, there was a quarterly meeting where the plan to meet the 2016 sales targets was discussed.  The Company had developed a two-pronged approach: (1) increase advertising on Barbie, given its high margin compared to other brands; and (2) to load retailers with various other less successful product lines.  The products in the latter part of the strategy did not materialize volume, according to FE1.  Propped up by a high advertising budget, Barbie sales, however, did pick up.

102.    Per FE1, at the quarterly meeting around September 2015, the Senior Vice President for Global Brands stated that Barbie sales were improving.  The Executive Vice President of Fischer Price at the time, noted that improving sales for Barbie were not enough to counter the sales declines in many of the Company's other products.  According to FE1, the Executive Vice President of Fischer Price stated that while sales for Barbie improved after increased advertising, the brand had an abysmal advertising to sales ration of 20%.  Per FE1, a healthy advertising to sales ratio would have been 5-7%.

103.    FE1's account of the Company's operations shows that the Company had already developed and utilized a practice of over-selling to its retailers to meet financial targets before the Relevant Period began.  The Company's senior management, per FE1, was aware of such practice.

104.    FE2 worked at the Company's El Segundo, California headquarters and reported to the Director of Customer Marketing for Target.  FE2 served the company from February 2016 to

August 2017 as a Senior Customer Marketing Analyst, assigned to the Company's seven-person Target Customer Marketing Team.  In his or her role, FE2 assisted in developing promotional plans for Company brands sold at Target's retail outlets, and was usually assigned a certain group of toys and "basically came up with promotions for the toys inside Target stores," per FE2.  The Target Team that FE2 was part of was within the larger Shopper Marketing Team, which included other teams dedicated to each of Amazon, Walmart, Target, and Toys "R" Us, the Company's four most important accounts.  FE2 analyzed promotional campaigns from inception to completion and evaluated what worked, and also determined whether the sales resulting from each campaign justified the costs related to it.

105.    Per FE2, the Company's sales did not recover after the 2015 holiday season, which left excess inventory on retailers' shelves in early 2016.  During her tenure at the Company, according to FE2, "sales were always down."  FE2 stated, "My first year we were told it was because they lost the contract for the Disney Princess brand, but this year [2017] it was the same issue."  Moreover, "Throughout [2016], we offered incentives for retail customers: you could buy one [toy] and get one free, or buy one and get half or another percentage off."  Per FE2, if the buyer for a store purchased too much product, they were permitted to discount it if it did not sell during the holidays.  FE2 recalled that some items in 2016 were discounted months before the year end.

106.    According to FE2, there was constant pressure to improve sales during the Company's third quarter ended September 30, 2016, and trickled down through the hierarchy.  FE2 stated, "There was definitely pressure to sell a lot," and "[Pressure] came from the Vice President of Shopper Marketing then from under him it came from the five directors who oversee each

account – from him, to my director, to my manager, then to me." According to FE2, FE2's manager would send an email or call urging FE2 to move product.

107.    The pre-existing build-up of inventory in the retail channel was enough of an issue by the end of 2016 that it was understood within the Company to be a "big problem." Although FE2 does not recall the precise timing, before the holiday season had ended FE2's superiors made the decision to dramatically cut prices. Per FE2, the Company's executives were aware of the surplus inventory levels in the retail channel prior to the fourth quarter 2016 results because, "the prices were cut before the end of the year . . . [m]aybe three months before the end of the year around October or September."

108.    According to FE2, at least for Target, the Company had access to the point-of-sale data through Mattel's inventory information web portal where FE2 and FE2's peers could check inventory by entering item numbers. FE2 stated, "Through the Target site, you could type in a [product] number and see sales for that item." During the 2016 holiday season, Barbie sales were continuing to lag with the fashion dolls line, according to FE2. Company employees received weekly point-of-sale data-based reports on inventory levels.

109.    The Company placed on its employees a great deal of pressure to flood its retail channels with inventory, per FE2. Prices were cut dramatically in an attempt to over-supply retailers far in advance of the year end. Based upon point-of-sale systems, the Company had access to its retailers' inventory levels. Therefore, the Individual Defendants knew that prices being reduced would only add to the inventory already in the retail channels.

110.    FE3 served as the Company's Senior Vice President and Chief Information Officer from August 2007 to June 2017, and worked at the Company's El Segundo, California headquarters. FE3 reported to Defendant Farr and was responsible for the Company's information

technology services, which included managing data center operations, implementation of the Company's information technology strategy, and overseeing applications development.  FE3 was also responsible for the systems managing the Company's manufacturing and inventory processes.  FE3 also oversaw information technology security and critical business capabilities, and managed the information technology systems supply chain and approximately 250 employees stationed at over 20 locations across the globe, in addition to over 700 contract workers and consultants.

111.    Per FE3, the Company rushed to remove inventory and other cost factors from its books for the end of 2016.  The Company's peak business period every year aligns with the end of its fiscal year.  As noted by FE3, "It creates an accounting problem: because all our money comes in at the end of the year, there's always this push to get inventory and other cost factors off the books."  FE3 stated, "It happened last year, at the end of 2016."  According to FE3, the way that the Company's upper management bonuses were calculated gave inventory a disproportionate importance. "Inventory is such a big deal," according to FE3, "you can hit all your numbers correctly, hit profitability and earnings per share, but if you don't clear inventory, it hurts your bonus."

112.    In the third quarter of 2016, the Company pushed its largest customers relentlessly to accept more inventory.  According to FE3, "We offer[ed] discounts and essentially pay[ed] [the retailers] to hold inventory."  As FE3 explained, "We get revenue in 2016; they get revenue in 2016, then they return [the surplus inventory] in 2017, but we still got revenue booked when we needed it."  FE3 stated that every sale was booked as revenue when the item left the Company's warehouse.

113.    Half of each executive's bonus at the highest level of Mattel was based on the results of the Company, with the other half based on personal results.  As noted by FE3, "You can

have the best year, but if Mattel doesn't hit overall [the bonus will be small]."  According to FE3, "We didn't hit in 2016 due to inventory," and, "My understanding was we were very close, what hurt us was inventory – we had too much based on what we were supposed to have."  Moreover, "The kicker was our cost was higher than expected; the head of our sales division [Defendant Dickson], at the end of the year gave some very large pricing and cost discounts to the retailers and we incurred higher costs to try to get product sold."  The timing of the pricing and cost discounts was intentional, and, per FE3, Defendants Sinclair, Farr, and Dickson, along with the Company's Chief Supply Chain Officer, monitored closely the point-of-sale inventory at its customers through point-of-sale information coming from the customers' stores.

114.    To encourage retailers to accept excess inventory during the Company's busiest season in the third and fourth quarters of 2016, the Company aggressively pushed trade-spend and offered return allowances and steep discounts.  Trade-spend refers to money the Company promises to spend to help retailers sell its products.  Per FE3, "It can be anything from signage, to advertising, to just giving retailors money to spend on advertising or marketing."  As explained by FE3, the Company depended on trade-spend, discounts, and return allowances more than its peers to move its products, given that the Company relied on a small number of retailers.  FE3 stated, "If you get in trouble and Walmart won't take your line, you can't make those sales up – you don't have 50 other accounts to go to."

115.    According to FE3, promotions and marketing played a huge role in pushing products through the retail channel in the third quarter 2016.  Retailers preferred to accept a minimum amount of a product and restock when they needed to, not ahead of time, while the Company sought to get as much product to each retailer as possible.  FE3 stated that "[i]n order to get retailers to take product, we had to offer rebates, trade spend and other incentives," and noted

that a particularly "sharp discount" was offered in fall of 2016. FE3 also recalled an additional tactic used by the Company, which was to tell its retail customers, "don't worry, we'll take it back," to inform them that they would not be forced to keep the excess inventory. FE3 further stated that the Company instructed its sales personnel to offer at sales meetings the incentives to retailers. FE3 noted, "I think we did it every year," and pointed out that the directive to do so came from Defendant Dickson, the top of sales, and trickled down through the ranks.

116. The Company fell short of reaching its targets in 2016 in particular, after Defendant Dickson, in an attempt to push inventory in the retail channel, overspent on trade-spend incentives. Discounts, rebates, return allowances, and trade spend were typical methods the Company utilized to push product from its warehouse to retailers in anticipation of the holiday season. Defendant Dickson, in 2016, impacted negatively the Company's margin by extending too much trade-spend to retailers. Per FE3, "In 2016, [Defendant Dickson], head of everything but manufacturing, went to extremes – he very aggressively pushed trade-spend and discounts to get retail to take product." Around the corporate office, the word was that upper managers failed to earn their bonuses because Defendant Dickson "spent money selling product we couldn't sell."

117. The loss of the Disney Princesses licensing rights, as explained by FE3, was a significant setback for the Company in 2016. According to FE3, "I'm not sure how big a gap; certainly in the hundreds of millions." FE3 stated, "When we lost the millions that came from the princesses, the challenge was making up for that business when sales had been stagnant for years." A constant topic of discussion among senior management of the Company during July, August, and September 2016 and into the fall, was inventory and the ways to move it. As stated by FE3, "Inventory was discussed endlessly," and, "People became micro-focused on how to make our [number] this year – there was no investment in training or restructuring."

118.    Concerns about the Company's slipping gross margins and deteriorating sales were persistent at the top of the Company's corporate hierarchy, and, per FE3, Defendant Farr reported that both topics were "discussed at every executive meeting."  Defendants Sinclair, Farr, and Dickson attended these monthly executive meetings, and after them, each executive would communicate the gist of the meeting to their department staff.  According to FE3, "As soon as the meeting was over, Kevin was pretty open.  He wouldn't share the [meeting] agenda, but he'd say, 'we need to do this,' or, 'this is the biggest thing.'"  FE3 further stated, "[Those directives] pressed down through senior leadership to each level of the company."  Often, per FE3, including in the third and fourth quarters of 2016, the main takeaway from the monthly executive meetings was "we needed to get sales up."

119.    FE3's account of the Company's operations provides further support that the Individual Defendants were incentivized to over-supply the Company's retailers with inventory. FE1, FE2, and FE3 noted that the Company over-supplied its retailers with inventory in an attempt to fill a gap in sales revenue created by the loss of the Disney products.  FE1, FE2, and FE3's comments further reveal that the Individual Defendants continued to supply the Company's retailers with product even though they were aware that inventory was not selling.

**SAB 104**

120.    SEC Staff Accounting Bulletin No. 104 requires disclosures concerning a company's recognition of revenue where shipments of products at the end of a reporting period reasonably might be expected to result in lower revenue and shipments in the next reporting period. The SEC's general instructions to Item 303 of Regulation S-K, concerning management's discussion and analysis of financial condition and results of operations in required annual and quarterly periodic reports state the companies "must specifically focus on known material events and uncertainties that would cause reported financial information not to be necessarily indicative

of future operating performance or of future financial condition" in order for investors to "ascertain the likelihood that past performance is indicative of future performance."[3]   The Individual Defendants failed to make such required disclosures in its October 27, 2016 Form 10-Q and its February 23, 2017 Form 10-K filed with the SEC, in violation of SEC rules.

**False and Misleading Statements**

***October 19, 2016 Press Release***

121.    On October 19, 2016, after the market closed, the Company issued a press release announcing its financial results for the third fiscal quarter ended September 30, 2016, noting gross sales of $1.98 billion and operating income of $317.4 million for the quarter.   The press release failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; and (3) Mattel failed to maintain internal controls.

122.    Instead, the press release noted that the Company's worldwide net sales were up 2% year-over-year, on a constant currency basis, and its operating income had increased by 5.5% over the same prior-year period.   The press release also included comments from Defendant Sinclair, who touted Mattel's third quarter financial results and outlook for its fourth quarter 2016, stating, in relevant part:

---

[3] *See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350; 34-48960; FR-72 (Effective Date: December 29, 2003).

"In the third quarter, we continued to make solid progress against our strategic priorities, and we are pleased with our momentum as we head into the holiday season," said Christopher Sinclair, Chairman and CEO of Mattel. "Our core brands continue to show improved strength and vibrancy, contributing to very encouraging and broad-based top-line momentum. And we continued to manage costs effectively, while making important investments in brand building, commercial excellence and emerging market expansion. Overall, our strategies are generating good progress on many fronts, and while we still have a critical fourth quarter to execute, we remain broadly on track to deliver on our full-year outlook."

### October 19, 2016 Conference Call

123.    Also on October 19, 2016, the Company held an earnings conference call with analysts and investors to discuss the Company's third quarter 2016 results.  During the conference call, the Individual Defendants failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; and (4) Mattel failed to maintain internal controls.

124.    During the conference call, Defendant Sinclair instead suggested that the Company's retail channel had normal inventory levels, stating that "consumer takeaway is aligning nicely with shipping."  Specifically, Defendant Sinclair stated:

So let me begin by saying that in the quarter, we continued to make some very good progress across all of our strategic priorities. We were especially encouraged by the momentum of our top line where our positive consumer takeaway is aligning nicely with shipping. This increases our confidence as we get set for the holiday season and as we look to deliver on our challenging 2016 top-line objectives.

125.    Defendant Dickson also made comments suggesting ordinary levels of inventory in the retail channel, stating that the company's gross sales (i.e., customer product shipments) were "aligned" with retail POS data.  Dickson stated, in relevant part:

> As you know, POS is the true barometer of a brand's success with shipping ultimately aligning to it over time. And our turnaround efforts focusing on consumer demand creation and better global commercial alignment are clearly gaining traction.
>
> Excluding the impact of Disney Princess, global POS continues to be up mid-single digits for the quarter and year to date with solid results across the majority of our brands. And gross sales, excluding Disney Princess, are aligned to POS with sales in constant currency up low-double digits for the quarter and up high-single digits year to date.

126.    Defendant Farr also commented during the conference call that during the third fiscal quarter 2016, product shipping was "better aligned" with positive retail POS, helping to position Mattel to execute for the fourth fiscal quarter 2016 and deliver its objectives for the fiscal year 2016.  Defendant Farr stated, in relevant part:

> Overall, our third-quarter results met expectations with shipping better aligned with positive POS, which positions us well to execute the fourth quarter and deliver our challenging top-line objectives for the year. We continue to focus on managing the P&L, leveraging sales and POS momentum, and cost savings initiatives to help offset continued ForEx headwinds and short-term mix challenges.

127.    Defendant Farr additionally commented on the Company's outlook, noting that Mattel "[did not] see any significant changes to [its] full-year 2016 outlook."  Defendant Farr stated, in relevant part:

> Looking ahead as Chris [Sinclair] said, as we enter the fourth quarter, we don't see any significant changes to our full-year 2016 outlook. We have a lot of work to do to execute the fourth quarter and our focus remains on delivering operating profit by balancing our top-line and managing the middle of the P&L. As expected, the unfavorable impact of ForEx did lessen in the third quarter, which we believe will continue.
>
> And given our third-quarter results, our revenue outlook has not changed. We've gained confidence with our results to date and believe we are well positioned to

meet our challenging 2016 revenue objective of relatively flat net sales in constant currency.

At the same time, we will work hard to achieve a full-year gross margin of about 48.5%. This continues to be an important area of focus as we still face ForEx and mix headwinds but we do expect to be in the range of this target. It means that we need to achieve a fourth-quarter gross margin rate around 51%, which is a challenge, but well within the ranges we have achieved in the past. The sequential improvement in gross margin is supported by incremental volume, improved mix from stronger trends in our girls properties with American Girl, Barbie, and DC Superhero Girls, a smaller Disney Princess impact, and by incremental flow-through from our supply chain and other cost savings initiatives.

128.    Defendant Farr reinforced confidence in the Company's ability to achieve its 2016 gross margin objective of 48.5% during the conference call's question and answer ("Q & A") session in an exchange with Felicia Hendrix, an Analyst at Barclay's Capital, which, in pertinent part, follows:

[Felicia Hendrix]

So just sticking on the topic of gross margins, and Kevin, you kind of gave color and we could have backed into what you need to be for the fourth quarter and you kind of highlighted that it's challenging. But just given all of the inputs, the puts and takes to get to that number for the fourth quarter taking into consideration there's challenging, I was just wondering how comfortable are you with your full-year gross margin outlook, like what could go wrong.

[Defendant Farr]

Yes, I think with regard to we don't control things like ForEx, and there's a lot of moving pieces like mix but when we look at it we feel pretty confident with regard to the 48.5% target, and we're working hard to achieve that and it's difficult to predict but we are working on a lot of the moving pieces including ForEx, mix, and incremental revenues, and we also expect to improve mix from our girls properties, American Girl, Barbie, and Disney or DC Superheroes. There is going to be a smaller impact from Disney Princess, and then we do see incremental flow through from our supply chain and other cost savings initiatives.

129.    The foregoing statements made on October 19, 2016 that the Company was "on track" to deliver on its full-year outlook were affirmatively false and misleading because the truth was that "consumer takeaway" was not "aligning nicely with shipping," and the Company was

shipping inventory to its retailers in excess of what they needed.  In fact, the Company was giving its retailers significant discounting offers and trade-spend promotions in an attempt to ship as much inventory as possible to its retailers in order to record revenue for the Company.  While inventory was being sold to retailers, the Individual Defendants were aware that the inventory would later be significantly discounted and/or returned to the Company.

### October 27, 2016 Form 10-Q

130.    On October 27, 2016, the Company filed a Form 10-Q with the SEC for the third fiscal quarter 2016 (the "3Q 2016 10-Q"), which was signed by Defendant Johnson.  The 3Q 2016 10-Q failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; and (4) Mattel failed to maintain internal controls.

131.    Instead, the 3Q 2016 10-Q provided substantially the same financial results presented in the Company's October 19, 2016 press release.

132.    The 3Q 2016 10-Q also falsely and misleadingly represented that the Company's disclosure controls and procedures were effective, stating, in relevant part:

> As of September 30, 2016, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive

officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms . . . . Based on this evaluation, Christopher A. Sinclair, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2016.

133.    Attached to the 3Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Sinclair and Farr attesting to the accuracy of the 3Q 2016 10-Q.

### *November 3, 2016 – Mattel Analyst Day*

134.    On November 3, 2016, the Company held its Mattel Analyst Day for 2016 (the "Analyst Day").  During the Analyst Day, the Individual Defendants failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; and (4) Mattel failed to maintain internal controls.

135.    Instead, Defendant Sinclair touted the Company's confidence in "driving sustainable profit growth" due, in part, to Mattel's growing and improving shipping performance and retailer POS.  Sinclair stated, in relevant part:

> [T]oday's Mattel is confident, aligned and focused on driving sustainable profitable growth and on building value for our shareholders.

From our efforts to transform this company, a new foundation has been set.  And I think it's fair to say that Mattel's strategy to reenergize its creative culture and to align its global commercial organization around refocused brand management and revitalized strategic partnerships is working.  And it's showing up in our results.

Our POS and shipping are significantly improved and growing.  Our core brands are building strength.  Our Toy Box is accelerating led by a vibrant slate of entertainment properties.  We're increasing our space, merchandising and support with many of our key retail and online customers.

We're also driving excellent growth in big emerging markets like China and Russia.  And we've significantly improved our cost structure.

And finally, we're effectively managing our P&L and balance sheet as we reinvest in growth, compensate for significant headwinds and foreign exchange [and] the loss of Disney Princess and support our dividend. Because of this momentum and of the foundation that we're building, I can say with a degree of confidence that we're poised for much more improved growth and a better outlook in '17 and beyond.

Over the balance of this morning, I hope that we can impart some of that same sense of confidence in all of you.

136.     During the Analyst Day, Defendant Sinclair additionally emphasized the power of the Company's brand portfolio to offset any revenue lost from the expiration in 2015 of Mattel's global rights to produce and sell toys based on the Disney Princess® characters.  He stated, in relevant part:

Consider the fact that despite the loss of Disney Princess, we're clearly on track to fully offset that shortfall by the end of this year.  To put that in perspective, that's essentially like creating a top 10 toy company in just one year's time.  A true testament to the power and diversity of our brand portfolio and of our ability to execute effectively as a company.

137.     Also during the Analyst Day, Defendant Dickson noted that the Company's relationships with its retail partners were allowing it to "create great in-store executions," with proof being provided by the Company's "positive and improving POS results."  Defendant Dickson stated, in relevant part:

> We have made significant strides in our relationships with our retail partners, which are not only resulting in increased shelf space but also allowing us to create great in-store executions.
>
> Our positive and improving POS results are proof that this is working.  And we're taking in-store execution to a whole other level with our new American Girl shop within a shop here at Toys "R" Us and we'll look to use that model to build the bigger presence with our other brands in the near future.

138.     Defendant Farr also made false and misleading statements about Mattel's operations during the Analyst Day, stating that based on, in part, "strategic pricing" and other initiatives, the Company was on track to deliver an approximate 48.5% gross margin for 2016. Farr stated, in relevant part:

> And as expected, gross margin was down in the third quarter primarily due to currency and mix, but these headwinds are being partially offset by significant cost savings, and while we expect foreign exchange to continue to lessen in the fourth quarter as it did in the third and mix to improve slightly.
>
> In the fourth quarter, we continue to rely on strategic pricing, cost savings and supply chain initiatives to partially offset the impact of forex and mix. Despite these headwinds, we remain on track to deliver a gross margin of about 48.5% for the full year.

139.     Moreover, Defendant Farr noted that the Company expected improvements to Mattel's gross margins in 2017, stating, in relevant part:

> However, we do plan on seeing year-over-year improvement in gross margin percentages despite potential challenges with mix.
>
> We expect gross margins to improve in 2017 versus 2016 due to improved scale relative to our fixed supply chain cost base as we grow significantly in 2017, a stronger performance by our girls portfolio driven by Barbie, American Girl, and DC Superhero Girls, and improving margin structure for MEGA, as we invest in manufacturing and gain scale. And the opportunity to strategically price our portfolio particularly in international markets where currencies have weakened significantly over the past couple of years.

140.    Defendant Farr additionally emphasized that operating margins would be improved by efficiencies in sales adjustments (i.e., trade discounts and other allowances), advertising spending, and inventory management.  He stated, in relevant part:

> Turning to our P&L levers to improve operating margins for 2017, we should continue to be efficient in our sales adjustments, which we are targeting to be in our historical range of 9% to 9.5%. With growing revenues, we'll be building out a better retail fulfillment strategy to optimize retail inventory positions and our owned inventory positions.
>
> Better demand planning and sourcing systems would help ensure that the right inventory is in the right place at the right time, which should improve the efficiency of our sales adjustments. And we expect foreign exchange to be less of a headwind in 2017, but our path to get back to gross margins of around 50% will likely extend beyond 2017.
>
> * * *
>
> Like sales adjustments, we should continue to be efficient in our advertising and look to target spending on the lower end of our historical range of 11% to 13%.
>
> As I mentioned, we have a very strong entertainment lineup in 2017 so we'll not need to spend as much on advertising those licenses compared to our owned I.P.

141.    During the Q & A session of the Analyst Day, in response to a question by an unidentified audience member, Defendant Dickson made positive comments regarding retail POS data for the Company's vital Barbie brand and the fourth fiscal quarter 2016. The exchange, in relevant part, was as follows:

> [Audience Member]
>
> Can you comment on Barbie POS trends in the fourth quarter so far?
>
> [Defendant Dickson]
>
> Well, so far so good. We've been quite pleased with Barbie's trend throughout the year for those tracking along which is a good group to say that to. . . . [T]he U.S. started out, I think, with a lot more momentum than the rest of the world as we indicated the rest of the world was catching up to all the marketing plans and some of the rollouts of the specific new refreshed product and as we've seen the rest of

the world get traction overall, now we're really quite pleased with Barbie's POS performance.

We are heading into what was, last year, a very good POS here for Barbie and so we are lapping and planning to lap a pretty aggressive POS season. That being said, as you see and feel, we've got momentum behind the brand. We've got renewed purpose around how we market the brand and how we speak to the brand, not only to consumers, but we've got retailer confidence, we've got increased shelf space.

We've implemented, if you will, media strategies surgically around the balance between  traditional TV and digital.

### Defendant Sinclair Removed as CEO

142.    On January 17, 2017, the Company filed a Form 8-K with the SEC announcing that Defendant Sinclair would resign from his role as CEO, effective February 8, 2017, and that Defendant Georgiadis would take his place.

### The Truth Begins to Emerge

### January 25, 2017 Press Release

143.    On January 25, 2017, the Company issued a press release announcing its financial results for the fourth fiscal quarter and fiscal year ended December 31, 2016, noting that for the fourth quarter on a year-over-year basis, its worldwide net sales had declined by 8% to $1.83 billion, operating income declined by 11% to $262.6 million, and gross margins declined by 14% to 47%.  The press release, however, failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the

Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.

144.    Instead, Defendant Sinclair misleadingly blamed Mattel's worse than expected fourth quarter 2016 operating performance on "industry-wide challenges," such as a significant slowdown for the holiday period in the U.S. toy category, stating, in relevant part:

> Our results were negatively impacted by a number of industry-wide challenges, including a significant U.S. toy category slowdown in the holiday period, and increased forex headwinds . . . . And while our sales at retail remained strong, the slowdown triggered elevated retail promotional activity and decreased shipping, all of which had a significant impact on our gross margin . . . .

> Even against this difficult backdrop, our core brands continued to show solid growth, and our performance in key emerging markets like China was equally strong. And, importantly, we offset a substantial revenue gap from the loss of the Disney Princess license. Looking forward, we remain broadly optimistic about Mattel's performance in 2017 and beyond. Our core brands are strong and growing, we have a solid lineup of entertainment properties in the pipeline, and we are forging valuable relationships with key retail partners throughout the world.

145.    Defendant Sinclair's attribution of the Company's disappointing operating performance to "industry-wide challenges," however, is contradicted by the financial results reported during the same period by Hasbro, Inc., Mattel's closest competitor, which reported an 11.23% increase in net sales, an 8.13% increase in gross profit, and minus only 1.35% in operating income for the fourth fiscal quarter 2016.

### *January 25, 2017 Conference Call*

146.    Also on January 25, 2017, the Company held an earnings conference call discussing the Company's fourth quarter and year end 2016 fiscal results.   During the conference call,

Defendant Sinclair disclosed that the Company's gross margins were "significantly impacted by elevated sales adjustments and by heavier discounting," which adversely affected the cash generated by the Company's operations.  Moreover, the conference call acknowledged that high levels of sales adjustments and discounting were required in order liquidate the retail channel's excess inventory.

147.    However, the Individual Defendants failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.

148.    Instead, the Individual Defendants downplayed the continuing risks arising from the Company's retail inventory levels existing at the end of the fourth quarter 2016.  Statements made by Defendants Sinclair and Farr during the conference call misleadingly described retail inventory levels as "moderately" elevated, and that retail inventory was within "a manageable range."

149.    During the Q & A session of the conference call, Defendants Sinclair and Farr were asked about the financial impact that the lingering excess inventory had on the Company's operating performance in the short term, to which they responded by misleadingly downplaying the impact and stating that excess inventory would "quickly" be eliminated and that the inventory levels were at a "balancing point."  One of the exchanges was, in relevant part, as follows:

[Greg Badishkanian, Analyst at Citi]

So, do you think you'll end Q1 with normalized inventory levels? And then, how much do you think the accelerated sales adjustments in Q1, how much will that impact Q1, if at all? And if you think that will continue into second quarter, assuming you have too high inventories entering into the second quarter? So, when will this kind of discontinue, in terms of the promotions, discounts, et cetera?

[Defendant Sinclair]

Greg, I think I would expect we'd be in pretty decent shape on inventory as we get through the first quarter, and it's really in pockets. So, this is not a horrendous issue at this point.

But as far as the allowances and discounting, I think we expect that to kind of be back to normalized levels at this point. And remember, a lot of that is actually being used not for pure discounting; it was to help accelerate some shipments. And so, I think that's sort of reached sort of a balance point with the major retailers. And I'd say most of them are fairly comfortable with where they're at right now, and the exit POS certainly helped everybody

[Defendant Farr]

And I'd just like to add on. Sales were below expectations, but our owned inventory is of good quality. We've got mostly good brand POS momentum exiting the year. And we'll work through the extra inventory quickly, and I don't think we have to discount it.

150.    During the conference call, Defendant Farr further commented that "the moderately high level of year-end retail inventories will likely reduce our revenues in the first quarter and have less than a 2% impact for the full year of 2017."  Tim Conder, an Analyst at Wells Fargo Securities asked for clarification on this comment, to which Defendant Sinclair misleadingly stated that "we

do have to work off a little bit of inventory in some pockets."  The relevant portion of the exchange, is as follows:

> [Tim Conder]
>
> Just to follow on a little bit on the prior question here. I think you had said previously regarding 2017 top line outlook -- and granted, Chris, what you just said, that the base bar has been lowered here -- but I think previously you had said somewhere up between mid- and high-single digits. And then, Kevin, in your comment you said you see 2017 being impacted less than 2% for a full year.
>
> So, was that reference point up mid- to high-single digits for year-over-year growth and now you're saying that range comes off less than 2%? Is that the proper way we should hear what you're saying?
>
> [Defendant Sinclair]
>
> I think that's probably a fair way to look at it, Tim. We're still confident that we're somewhere in the mid to the up-middle range of growth. But we do have to work off a little bit of inventory in some pockets. That's probably more of a first quarter issue, but obviously it affects full year.

151.    Furthermore, during the conference call, Defendant Sinclair disclosed that "discounting had already been sort of heavily underway" for the excess inventory.

152.    Mattel's January 25, 2017 statements created and false and misleading impression that the Company's retailers' inventory levels were not a significant issue and that allowances and discounting were "normalizing."  In fact, as later revealed, the Company's efforts to provide its retailers significant discounting offers and trade-spend promotions in an attempt to ship as much inventory as possible to its retailers to record more revenue for the Company proved to be a significant issue.

153.    On this news, the price per share of Mattel stock fell $5.57, or approximately 18%, from the previous day's closing price to close at $25.99 per share on January 26, 2017.

*January 30, 2017 Moody's Review for Downgrade*

154.    On January 30, 2017, Moody's put the Company's credit on review for downgrade, citing discounting at retail that contributed to Mattel's lower cash flow and narrowed profit margins.

155.    On this news, the price per share of Mattel stock fell $0.11 per share from the previous day's closing price to close at $26.21 per share on January 31, 2017.  By the close of market on February 1, 2017, the price per share of Mattel stock had fallen further to $25.51.

*February 17, 2017 Toy Fair Presentation*

156.    On February 17, 2017, the Company held its Toy Fair Presentation.  During the Toy Fair Presentation, the Individual Defendants failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.

157.    Instead, during the Toy Fair Presentation, Defendant Farr falsely and misleadingly stated, "[w]e expect first quarter revenues to be [down] mid to high single digits as a result of the

elevated retail inventory at year-end 2016." Farr further noted that gross margins for the first quarter 2017 would be down "moderately" as a result of foreign exchange headwinds and targeted inventory cleanup.

158.    Notably, during the Toy Fair Presentation, the Company's Executive Vice President and Chief Commercial Officer, Steven Totzke ("Totzke"), noted to investors that he receives "live feedback" on the status of the Company's inventory, stating, in relevant part, "I get a lot of live feedback on the state of our space, and our product placement and our inventory levels." Totzke's receipt of such information indicates that at least some of the Individual Defendants also received the same, or, that the Individual Defendants at the very least had access to it.

159.    On this news, the price per share of Mattel stock fell $0.31 per share from the previous day's closing price to close at $25.79 per share on February 21, 2017, the first day the market was open after February 17, 2017.

### February 21, 2017 Toy Fair Conference Q & A Session

160.    On February 21, 2017, the Company held a Q & A session for its Toy Fair. During the session, the Individual Defendants failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017

as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.

161.    Instead, Defendant Sinclair acknowledged that the Company, in advance of the fourth quarter 2016, loaded up the retail channel based upon "a pretty positive set of plans" for the quarter.  Moreover, he noted that the Company later engaged in "discounting to support shipping and tried to move product off of retail."  Defendant Sinclair stated, in relevant part:

> Let me begin by sort of once again saying that, clearly, we had a difficult fourth quarter and we are disappointed with the results, which we found to be more difficult than anticipated. Essentially, what we had done is we had built a pretty positive set of plans for the fourth quarter based on the assumption that we would maintain the strong momentum we had in POS leading into the fourth quarter.
>
> Obviously, as the category began to slow down fairly precipitously in the first few weeks of December, we were forced to scramble. And I would tell you that, frankly, we didn't have a lot of levers to pull. We were relying very heavily on our core brands and the momentum of those core brands. We didn't have any big entertainment or new products to sort of help buttress things, so we were probably a little more vulnerable than we would have liked. So that was sort of the major thing.
>
> We obviously got into discounting to support shipping and tried to move product off of retail. At the same time that that was occurring, we faced another fairly big headwind, which was some of our international currencies. Particularly, the euro and the Mexican peso deteriorated fairly significant starting in November after the US election. So we kind of faced a perfect storm, if you will. We had two things coming together. And obviously, the fourth quarter was not what we anticipated.
>
> But I said again on Friday, look, we own the results. We think we made the right decisions at the time to try to get our shipments in and try to get product moving at retail. But clearly, it cost us financially. So net, not where we expected to be or wanted to be in the quarter.

162.    Also during the session, Defendant Sinclair was asked about the state of Mattel's business in Europe, to which he falsely and misleadingly represented that the Company was "fairly

healthy in terms of inventory" and "in reasonably good shape" in Europe.  The exchange was, in

relevant part, as follows:

> [Linda Bolton Weiser, Analyst at B. Riley & Co.]
>
> So when you reported the fourth-quarter results, there was a lot of discussion around the significant increase in sales adjustments in North America. But when you really look at the results, the adjustment in North America was only about 2%, but it was actually quite a bit larger in Europe and Latin America. So, could you give us a little bit of state of the union kind of on those regional markets and how you ended the year and also, on a longer-term basis, where you think the opportunities are and how you are competitively in those markets?
>
> [Defendant Sinclair]
>
> I'll take a shot at that, Linda. Your assessments are completely accurate. The issues started here in North America with a slowdown, and that's where we sort of first responded. But it was almost simultaneous. We saw the same trends in Europe, and even Latin America showed some softening as well as Australia.
>
> I'd say we were probably better positioned here in the US, frankly, as we got into trying to get product into the stores and discounting, than we were in Europe. Europe, because Disney Princess was a much bigger factor, frankly, we probably had less in our arsenal there to work with. So I think we scrambled across the board. It was a combination of Europe, North America, and parts of Latin America where we saw elevated discounting.
>
> On balance, though, I think we came out in Europe in reasonably good shape. Our trends were good. Our business there is fairly healthy in terms of inventory.

### *February 23, 2017 Form 10-K*

163.    On February 23, 2017, the Company filed a Form 10-K with the SEC (the "2016

10-K"), signed by Defendants Georgiadis, Farr, Johnson, Sinclair, Dolan, Edwards, Fergusson,

Lewnes, Ng, Prabhu, Scarborough, Van de Put, and Loyd.  The 2016 10-K failed to disclose that:

(1) the Company's retail customers had enormously high levels of unsold Mattel products as a

result of the Company using sales adjustments and discounting tactics to over-supply its retailers

with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels

of unsold inventory, the Company had greater risk of (a) having to further issue its retailers

financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.

164.    Instead, the 2016 10-K provided substantially the same financial results presented in the Company's January 25, 2017 press release and discussed Mattel's inventory generally, stating, in relevant part:

> Retailers have also been attempting to manage their inventories more tightly in recent years, requiring Mattel to ship products closer to the time the retailers expect to sell the products to consumers. These factors increase the risk that Mattel may not be able to meet demand for certain products at peak demand times or that Mattel's own inventory levels may be adversely impacted by the need to pre-build products before orders are placed. Additionally, as retailers manage their inventories, Mattel experiences cyclical ordering patterns for products and product lines that may cause its sales to vary significantly from period to period.
>
> In anticipation of retail sales in the traditional holiday season, Mattel significantly increases its production in advance of the peak selling period, resulting in a corresponding build-up of inventory levels in the first three quarters of its fiscal year.

165.    The 2016 10-K also falsely and misleadingly represented that the Company's disclosure controls and procedures were effective, stating, in relevant part:

> As of December 31, 2016, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive

officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of December 31, 2016.

166.    Attached to the 2016 10-K were SOX certifications signed by Defendants Georgiadis and Farr attesting to its accuracy.

### April 5, 2017 Proxy Statement

167.    On April 5, 2017, the Company filed the 2017 Proxy Statement with the SEC.  The 2017 Proxy Statement failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.

168.    Instead, the 2017 Proxy Statement attributed disappointing financial results for the fiscal year 2016 to "industry-wide challenges" and "increased foreign exchange headwinds," stating, in relevant part:

Throughout 2016 management maintained sharp focus on executing against our strategic priorities and continued to drive progress; however, our full-year financial results were meaningfully impacted by evolving market conditions during the critical 2016 holiday period. The holiday period was characterized by industry-wide challenges, including a significant U.S. toy category slowdown, and increased foreign exchange headwinds. And while the U.S. toy category made a strong recovery the last two weeks of the year, the unexpected slowdown resulted in increased promotional activity and decreased shipping, which had a significant impact on our gross margin and negatively impacted our 2016 financial results.

* * *

Despite a difficult fourth quarter that negatively impacted our 2016 financial results, we made continued progress on our turnaround efforts and strategic priorities, which we believe are fundamental to creating long-term value.

169.    The 2017 Proxy statement also noted that the Board had adopted the Code of Conduct and that the Code of Conduct applies to all of Mattel's employees, with certain of its provisions applying to the Board.  Moreover, the 2017 Proxy Statement stated that the Company "regularly conduct[s] extensive stockholder outreach and believe[s] that proactive and transparent communication with our stockholders is essential to effective corporate governance."  These statements were specifically false and misleading due to the Individual Defendants' failures to abide by the requirements of the Code of Conduct and the Individual Defendants' false and misleading statements and omissions referenced herein.

### **The Truth Fully Emerges**

*April 20, 2017 Press Release*

170.    On April 20, 2017, the Company issued a press release after the market closed announcing its financial results for the first fiscal quarter ended March 31, 2017, and revealing that for the quarter, on a year-over-year basis, worldwide gross margins and net sales had each declined by more than 15% and the Company's operating loss increased by more than 158% to $127 million.

171.    The Company's shocking first quarter 2017 results surprised securities analysts and were far below Wall Street consensus estimates.  Wall Street analysts expected a 7.8% decline, but the Company's 15% net sales decline was almost twice that figure.  Moreover, the Company's gross margins reported for the first quarter 2017 were 520 basis points less than expected Wall Street consensus estimates.  Notably, the Company's revenue decline during the quarter was well above the "mid to high single digits" decline stated by Defendant Farr at the Company's February 17, 2017 Toy Fair, at which point the first quarter 2017 was more than halfway complete.

172.    Defendant Georgiadis commented on the Company's disappointing first quarter results and attributed them to "the retail inventory overhang coming out of the holiday period," revealing how significant the overhang actually was.  She stated, in relevant part:

> Our Q1 results were below our expectations due to the retail inventory overhang coming out of the holiday period, but we remain encouraged by strong performance at retail for our key core brands, including Barbie, Hot Wheels and Fisher-Price as well as sustained momentum in high-growth markets like China . . . .  We are confident we have worked through the majority of this overhang and look forward to a strong launch of Disney's Cars 3 theatrical release in the second quarter. While we have a lot of work to do to successfully position Mattel for the future, we see a clear runway to improving growth and profitability over time.

***April 20, 2017 Conference Call***

173.    Also on April 20, 2017, the Company held an earnings conference call discussing its results for the first fiscal quarter 2017.  During the conference call, Defendant Farr commented on the impact of the retail inventory overhang, stating, in relevant part, "[w]hat we didn't expect was the prolonged impact from the retail inventory overhang and the resulting slower pace of reorders by retailers, with sales in North America and Europe particularly impacted."

174.    On this news, the price per share of Mattel stock fell $3.42, or approximately 14%, from the previous day's closing price to close at $21.79 per share on April 21, 2017.

### *Defendant Farr Removed as CFO*

175.    On July 17, 2017, the Company filed a Form 8-K with the SEC announcing that Defendant Farr would separate from the Company when a successor has been named and successfully transitioned.  Defendant Farr separated from the Company effective as of September 29, 2017.

### <u>Repurchases</u>

176.    After the April 20, 2017 press release and conference call, the price per share of Mattel stock fell to a closing price of $21.79 per share on April 21, 2017.  This price reflected the true price per share of Mattel stock, had the Individual Defendants not engaged in their schemes as outlined herein.  Therefore, any repurchases by the Company should have been made valuing their common stock at $21.79 per share.  In breach of their fiduciary duties, the Individual Defendants caused the following repurchases.

177.    For the two months ended December 31, 2016, the Individual Defendants caused the Company to repurchase 30,954 shares withheld from employees to satisfy minimum tax withholding obligations that occur upon vesting of restricted stock units at an average price per share of approximately $29.67, for a total cost to the Company of over $918,475.

178.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on average $7.88 more than each such share was worth during the two months ended December 31, 2016.

179.    Thus, the total over-payment by the Company for its repurchases of its own stock during the two months ended December 31, 2016 was over $243,917.

180.    For the three months ended March 31, 2017, the Individual Defendants caused the Company to repurchase 58,047 shares withheld from employees to satisfy minimum tax withholding obligations that occur upon vesting of restricted stock units at an average price per share of approximately $25.71, for a total cost to the Company of over $1,492,557.

181.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on average $3.92 more than each such share was worth during the three months ended March 31, 2017.

182.    Thus, the total over-payment by the Company for its repurchases of its own stock during the three months ended March 31, 2017 was over $227,544.

183.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $471,461.

### Summary of Individual Defendants' Misconduct

184.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.  The statements referenced above were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with

inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

185.    Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein.

186.    The Individual Defendants also breached their fiduciary duties by wasting the Company's corporate assets through channel stuffing.

187.    Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, the Company overpaid for repurchases of its own common stock, and one of the Individual Defendants benefitted himself by engaging in insider sales.

188.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

## DAMAGES TO MATTEL

189.    As a direct and proximate result of the Individual Defendants' conduct, Mattel will lose and expend many millions of dollars.

190.    Such losses include over $471,461 the Company overpaid when it repurchased its own common stock during the Relevant Period before the fraud was exposed at artificially inflated prices.

191.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, its COO, its former CFO, and its Senior Vice President and Corporate Controller, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

192.    Such expenditures also include, but are not limited to, those connected to channel stuffing.

193.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

194.    Moreover, these expenditures include, but are not limited to, a higher cost of financing, which has been caused by the downgrading of the Company's credit and financial institutions' awareness of the misconduct alleged herein.

195.    As a direct and proximate result of the Individual Defendants' conduct, Mattel has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

196.    Plaintiff brings this action derivatively and for the benefit of Mattel to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Mattel, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

197.    Mattel is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

198.    Plaintiff is, and has been at all relevant times, a shareholder of Mattel.  Plaintiff will adequately and fairly represent the interests of Mattel in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

199.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

200.    A pre-suit demand on the Board of Mattel is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following eleven individuals: Defendants Dolan, Edwards, Fergusson, Georgiadis, Lewnes, Ng, Prabhu, Scarborough, Sinclair, and Loyd (the "Director-Defendants"); and non-defendant Ynon Kreiz (together with the Director-Defendants, the "Directors").  Plaintiff needs only to allege demand futility as to six of the eleven directors that were on the Board at the time this action was commenced.

201.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to cause the Company to engage in channel stuffing and to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they simultaneously caused the Company to repurchase its own stock at artificially inflated prices and one of the Director-Defendants engaged in insider sales, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

202.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage in channel stuffing and in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, the Company repurchased its own stock at artificially inflated prices and one of the Individual Defendants sold $277,110 worth of Company stock at artificially inflated prices based on material inside information.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

203.    Additional reasons that demand on Defendant Sinclair is futile follow.  Defendant Sinclair currently serves as the Board's Executive Chairman and served as the Company's CEO from April 2015 to February 2017, and is thus, as the Company admits in the 2017 Proxy Statement, a non-independent director.  He received lavish compensation, including $9,225,193 in 2016.  Defendant Sinclair was ultimately responsible for all of the false and misleading statements and omissions that were made during his time as CEO, including those contained in the foregoing SEC filings, press releases, and conferences calls, the vast majority of which he personally made

statements in.  His large Company stock holding, worth approximately $41.5 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's highest officer and as a trusted Company director at all relevant times, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  He also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock.  Moreover, Defendant Sinclair is a defendant in the Securities Class Action.   For these reasons, too, Defendant Sinclair breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Georgiadis is futile follow. Defendant Georgiadis has served as the Company's CEO since February 2017, and is thus, as the Company admits in the 2017 Proxy Statement, a non-independent director.  She is entitled to lavish compensation, including up to $11,250,000 in 2016.   Defendant Georgiadis was ultimately responsible for all of the false and misleading statements and omissions that were made after her appointment as CEO, including those contained in the foregoing SEC filings, press releases, and conferences calls, many of which she personally made statements in.  Her large Company stock holding, worth approximately $2.7 million before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible.  As the Company's highest officer and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement

in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock. For these reasons, too, Defendant Georgiadis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

205. Additional reasons that demand on Defendant Ng is futile follow. Defendant Ng has served as a Company director since 2006 and is a member of the Audit Committee and a member of the Finance Committee. He received lavish compensation, including $280,002 in 2016. His large Company stock holding, worth $239,020 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock. Defendant Ng's insider sale before the fraud was exposed, which yielded $277,110 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Thus, for these

reasons, too, Defendant Ng breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206. Additional reasons that demand on Defendant Dolan is futile follow. Defendant Dolan has served as a Company director since 2004 and as the Board's Independent Lead Director since January 2015. He is also Chair of the Compensation Committee, Chair of the Executive committee, and a member of the Governance and Social Responsibility Committee. He received lavish compensation, including $330,002 in 2016. His large Company stock holding, worth approximately $2.6 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock. Thus, for these reasons, too, Defendant Dolan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

207. Additional reasons that demand on Defendant Edwards is futile follow. Defendant Edwards has served as a Company director since 2012 and is a member of the Compensation Committee and a member of the Governance and Social Responsibility Committee. He received lavish compensation, including $266,002 in 2016. His large Company stock holding, worth

approximately $261,664 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.   As a long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.   Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein.   He also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock.   Thus, for these reasons, too, Defendant Edwards breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208.   Additional reasons that demand on Defendant Fergusson is futile follow. Defendant Fergusson has served as a Company director since 2006 and Chair of the Governance and Social Responsibility Committee, a member of the Executive Committee, and a member of the Finance Committee.   He received lavish compensation, including $275,902 in 2016.   His large Company stock holding, worth approximately $788,137 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.   As a long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.   Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein.   He also conducted

little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock.  Thus, for these reasons, too, Defendant Fergusson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on Defendant Lewnes is futile follow.  Defendant Lewnes has served as a Company director since 2015 and is a member of the Governance and Social Responsibility Committee.  She received lavish compensation, including $255,002 in 2016. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  Moreover, she signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein. She also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock.  Thus, for these reasons, too, Defendant Lewnes breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant Prabhu is futile follow.  Defendant Prabhu has served as a Company director since 2007 and is Chair of the Audit Committee, a member of the Executive Committee, and a member of the Finance Committee.  He received lavish compensation, including $300,002 in 2016.  His large Company stock holding, worth approximately $737,817 before the fraud was exposed, reveals his interest in keeping the

Company's stock price as high as possible.  As a long-time director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein.  He also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock.  Thus, for these reasons, too, Defendant Prabhu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Scarborough is futile follow. Defendant Scarborough has served as a Company director since 2007 and is Chair of the Finance Committee, a member of the Compensation Committee, and a member of the Executive Committee.  He received lavish compensation, including $262,502 in 2016.  His large Company stock holding, worth approximately $882,436 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein.  He also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying

more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock. Thus, for these reasons, too, Defendant Scarborough breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Loyd is futile follow. Defendant Loyd has served as a Company director since 2001 and is a member of the Audit Committee and a member of the Compensation Committee. She received lavish compensation, including $280,002 in 2016. Her large Company stock holding, worth approximately $286,849 before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible. As a long-time director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to engage in channel stuffing and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein. She also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over-paying more than $471,461 total during the Relevant Period before the fraud was exposed for repurchases of its own common stock. Thus, for these reasons, too, Defendant Loyd breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

213.    Additional reasons that demand on the Board is futile follow.

214.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and

in the best interests of the Company and the shareholders.  In fact, seven of the Director-Defendants have served on the Board for nearly a decade or longer.  These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, demand upon the Director-Defendants would be futile.

215.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.  In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the "accuracy of company records, public reports and communications," and uphold the responsibilities related thereto.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

216.    Mattel has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Mattel any part of the damages Mattel suffered and will continue to suffer thereby.  Thus, any demand upon the Directors would be futile.

217.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

218. The acts complained of herein constitute violations of fiduciary duties owed by Mattel's officers and directors, and these acts are incapable of ratification.

219. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Mattel. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Mattel, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

220. If there is no directors' and officers' liability insurance, then the Directors will not cause Mattel to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

221.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

224.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

225.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually

extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.

226. Moreover, the 2017 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to issue false and misleading statements and/or omissions of material fact and to engage in higher spending promotional levels.

227. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

228. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

229.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the below noted defendant. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

230.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of**
**Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

231.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Mattel.  Not only is Mattel now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Mattel by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over $2.4 million of its own shares on the open market at artificially-inflated prices, damaging Mattel by hundreds of thousands of dollars.

233.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify

the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

234.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Mattel not misleading.

235.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Mattel.

236.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

237.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving

as a director would signed the Company's false and misleading 2016 10-K, including Defendants Georgiadis, Farr, Johnson, Sinclair, Dolan, Edwards, Fergusson, Lewnes, Ng, Prabhu, Scarborough, Van de Put, and Loyd.

238.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

239.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

240.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241.    The Individual Defendants, by virtue of their positions with Mattel and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Mattel and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act.  The Individual Defendants had the power and influence and exercised the same to cause Mattel to engage in the illegal conduct and practices complained of herein.

242.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mattel's business and affairs.

245.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

246.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mattel.

247.    In breach of their fiduciary duties owed to Mattel, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company's retail customers had enormously high levels of unsold Mattel products as a result of the Company using sales adjustments and discounting tactics to over-supply its retailers with inventory to inflate the Company's revenue; (2) due to its retailers' unusually extreme levels of unsold inventory, the Company had greater risk of (a) having to further issue its retailers financial concessions, in the form of discounts, sales adjustments, and promotions, or even having to accept returns, in order to remove the excess inventory, and (b) experiencing slower sales growth in future periods; (3) the Company was experiencing adverse, prolonged financial effects during the first fiscal quarter 2017 as a result of the existing overhang of the unusually extreme levels of unsold inventory by its retailers, such as reduced orders by its retailers; (4) retailer point-of-sale data and shipments to retailers were not "aligned" or balanced; (5) North American and European sales in the first fiscal quarter 2017 were experiencing sales shortfalls; and (6) Mattel failed to maintain internal controls.

248.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

249.    The Individual Defendants further breached their fiduciary duties by wasting the Company's corporate assets through channel stuffing.

250.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

251.    In yet a further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company during the Relevant Period before the fraud was exposed to repurchase its own common stock at artificially inflated prices, such that it overpaid by more than $471,461.

252.    Additionally, an Individual Defendant engaged in a lucrative insider sale while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact referenced herein.

253.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mattel's securities and disguising insider sales.

254.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not

adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mattel's securities and engaging in insider sales.

255.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

256.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mattel has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

257.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

258.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Mattel.

260.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Mattel that was tied to the performance or artificially inflated valuation of Mattel, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

261.    Plaintiff, as a shareholder and a representative of Mattel, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

262.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

263.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

264.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Mattel, for which they are legally responsible.

265.    As a direct and proximate result of the Individual Defendants' abuse of control, Mattel has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Mattel has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

266.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of Mattel in a manner consistent with the operations of a publicly-held corporation.

269.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Mattel has sustained and will continue to sustain significant damages.

270.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

271.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

272.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

273.    The Individual Defendants caused the Company to engage in channel stuffing, to repurchase its own stock at artificially inflated prices, and to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

274.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Mattel to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

275.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

276.    Plaintiff on behalf of Mattel has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Mattel, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Mattel;

(c)     Determining and awarding to Mattel the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Mattel and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Mattel and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Mattel to nominate at least six candidates for election to the board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations; and

4. a proposal prohibiting the Company from repurchasing common stock on

the open market or from senior executives pursuant to Rule 10b5-1 trading plans within six months of sales of Mattel common stock by the Company's senior executives.

(e)     Awarding Mattel restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: December 21, 2017                    Respectfully submitted,

                                            **FARNAN LLP**

                                            /s/ Brian E. Farnan_____
                                            Brian E. Farnan (Bar No. 4089)
                                            Michael J. Farnan (Bar No. 5165)
                                            919 N. Market St., 12th Floor
                                            Wilmington, DE 19801
                                            Telephone: (302) 777-0300
                                            Facsimile: (302) 777-0301
                                            Email: bfarnan@farnanlaw.com
                                                   mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net