### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARIANO LOMBARDI, derivatively on behalf of MATTEL, INC., | |
| Plaintiff, | **C.A. No. 17-cv-1842-CFC** |
| vs. | |
| YNON KREIZ, MARGARET H. GEORGIADIS, JOSEPH J. EUTENEUER, JOSEPH B. JOHNSON, R. TODD BRADLEY, ADRIANA CISNEROS, MICHAEL J. DOLAN, TREVOR A. EDWARDS, FRANCES D. FERGUSSON, SOREN T. LAURSEN, ANN LEWNES, KATHY W. LOYD, ROGER LYNCH, DOMINIC NG, JUDY D. OLIAN, VASANT M. PRABHU, DEAN A. SCARBOROUGH, CHRISTOPHER A. SINCLAIR, and PRICEWATERHOUSECOOPERS LLP, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MATTEL, INC., | |
| Nominal Defendant. | |

### VERIFIED SHAREHOLDER DERIVATIVE AMENDED COMPLAINT

### INTRODUCTION

Plaintiff Mariano Lombardi ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Mattel, Inc. ("Mattel" or the "Company"), files this Verified Shareholder Derivative Amended Complaint ("Amended Complaint") against Individual Defendants Ynon Kreiz, Margaret H. Georgiadis, Joseph J. Euteneuer, Joseph B. Johnson, R. Todd Bradley, Adriana Cisneros, Michael J. Dolan, Trevor A. Edwards, Frances D. Fergusson, Soren T.

Laursen, Ann Lewnes, Kathy W. Loyd, Roger Lynch, Dominic Ng, Judy D. Olian, Vasant M. Prabhu, Dean A. Scarborough, and Christopher A. Sinclair (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Mattel, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against PricewaterhouseCoopers LLP ("PwC," and together with Mattel and the Individual Defendants, the "Defendants") for violations of Section 10(b) of the Exchange Act and for aiding and abetting the Individual Defendants' violations of law. As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mattel, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Mattel's directors and officers from August 2, 2017 through August 8, 2019 (the "Relevant Period").

2.      Mattel is one of the largest toy manufacturing and children's entertainment company in the world. The Company, founded in 1945, designs, manufactures, and markets toy products that are sold worldwide to the retail customers and directly to consumers. The Company's

2

portfolio of brands and products are divided into major brand categories and include popular brands such as Barbie® fashion dolls, Hot Wheels®, and Thomas & Friends®. The Company "believes its products are among the most widely recognized toy products in the world."

3.       In the years leading up to the beginning of the Relevant Period, the Company was underperforming compared to its peers, in large part due to deteriorating sales and gross margins, higher promotional spending levels, and the Company's products failing to resonate with its customer base. Since losing an important product license in 2015, the Company's management has experienced significant shakeups, with the role of Chief Executive Officer ("CEO") changing hands three times in only three years.

4.       In light of the problems that the Company was facing, investors were keenly focused on the Company's financial results during this period, and especially the Company's reported net loss.

5.       Unfortunately, the Company's prospects continued to lag through the beginning of the Relevant Period. The Company experienced large sales declines during 2017, and during the third fiscal quarter of 2017, the Company reported $603.2 million in net loss. However, unbeknownst to the investing public, this particular statistic was understated by $109 million, due to a miscalculation of the Company's tax valuation allowance related to the Company's Thomas & Friends® asset.

6.       Subsequently, certain of the Individual Defendants conspired with PwC, the Company's independent auditor, to disguise the misstatement by inappropriately shifting the $109 million net loss to the Company's reported net loss for the fourth fiscal quarter of 2017. As would later be revealed, the Individual Defendants and PwC were aware that the prior misstatement

demonstrated a material weakness in the Company's internal controls and feared the ramifications of any restatement.

7.     This coverup persisted for almost two years, with each of the Company's financial statements issued during the Relevant Period on Forms 10-Q and 10-K certifying that those statements fairly represented the state of the Company's financial condition and representing that the Company maintained effective internal controls.  Moreover, each of the Company's annual consolidated financial reports issued to the public and filed with the SEC during the Relevant Period contained "clean" audit opinions from PwC, which certified the accuracy of the Company's financial reporting and the effectiveness of the Company's internal controls.

8.     The truth began to emerge on August 8, 2019, when the Company shocked the investing public by terminating a $250 million offering of senior notes due in 2027 (the "Notes Offering") on the day that the offering was expected to close. The Company revealed that the cancellation was a result of the Company receiving an anonymous whistleblower letter that detailed accounting errors in the Company's financial statements and questioned the independence of the Company's outside auditor, PwC.

9.     On this news, the price of the Company's stock plummeted from $13.43 per share at the close of trading on August 8, 2019, to $11.31 per share at the close of trading on August 9, 2019, representing a loss in value of over 15%.

10.     Over the course of the next several months, additional information emerged that further illustrated the gravity of the misconduct that took place during the Relevant Period.

11.      On October 29, 2019, the Company issued three press releases, also filed as exhibits to a current report filed with the SEC on Form 8-K the same day, revealing that an internal investigation by the Company's Audit Committee had uncovered material weaknesses in the

4

Company's internal controls as well as accounting "errors" in several of the Company's financial statements, including that income tax expense had been understated by $109 million in the third quarter of 2017 and overstated by the same amount in the fourth quarter of 2017. The Audit Committee investigation also found "management's reliance on the accounting advice sought and received on the error from the lead audit engagement partner of Mattel's outside auditor, and lapses in judgment by management contributed to [failures to properly asses, document, report, and disclose the error]." As a result, certain of the Company's financial statements would need to be revised prospectively, and the Company's annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K") would need to be restated. The press releases also announced that the Company's Chief Financial Officer ("CFO") would be leaving the Company and Mattel had begun searching for a new CFO.

12.     On November 6, 2019, *The Wall Street Journal* published an article containing the account of a former director of tax reporting at Mattel named Brett Whitaker ("Whitaker").[1] According to Whitaker, senior accounting executives at Mattel were aware of and actively worked with PwC to conceal the internal control deficiencies. Whitaker maintained that on one occasion, a Mattel accounting executive stated that if the Company disclosed a material weakness in its internal controls, it would be "the kiss of death" for Mattel.

13.     On November 8, 2019, *Bloomberg* published an article revealing that PwC had been placed under investigation by the Public Company Accounting Oversight Board ("PCAOB") in connection with PwC's audit of Mattel, and moreover, the PwC partner in charge of Mattel's audit team had been placed on administrative leave.[2]

---

[1]     https://www.wsj.com/articles/mattel-pwc-obscured-accounting-issues-former-executive-says-11573036201 (last visited April 3, 2020).
[2]     https://www.bloomberg.com/news/articles/2019-11-08/pwc-role-in-mattel-reporting-under-

14.    Lastly, on February 25, 2020, the Company issued its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), which revealed that in December 2019, the Company had received a subpoena from the SEC seeking documents related to the whistleblower letter and the Company's internal audit investigation.

15.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices, and by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects, and regulatory compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes Offering and restate certain of its financial statements.

16.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

---

review-by-u-s-audit-watchdog (last visited April 3, 2020).

17.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

18.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 1,479,167 shares of the Company's common stock were repurchased during the Relevant Period for over $23.2 million. As the Company's stock was actually only worth $11.31 per share during that time, the price at closing on August 9, 2019, the Company overpaid by over $6.48 million in total.

19.     In light of the Individual Defendants' and PwC's misconduct, which has subjected the Company to two federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California, one naming the Company and its CFO as defendants, and the other naming the Company, its CEO, its former CEO, its CFO, and PwC as defendants (together, the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, including through overpayment for stock through repurchases, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

20.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO-Chairman's liability in one of the Securities Class Actions, their being beholden to each other, their

7

longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Mattel's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because Mattel is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Mattel.  Plaintiff has continuously held Mattel common stock since before the beginning of the Relevant Period.

### Nominal Defendant Mattel

26.     Mattel is a Delaware corporation with its principal executive offices at 333 Continental Boulevard, El Segundo, California 90245.  Mattel's shares trade on the NASDAQ under the ticker symbol "MAT."

**Defendant Kreiz**

27.     Defendant Ynon Kreiz ("Kreiz") has served as the Company's Chairman and CEO since April 26, 2018, and as a Company director since June 13, 2017.  He also serves as the sole member of the Company's Equity Grant Allocation Committee. According to the Company's Schedule 14A filed with the SEC on April 4, 2019 (the "2019 Proxy Statement), as of March 22, 2019, Defendant Kreiz beneficially owned 71,425 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2019 was $13.21, Defendant Kreiz owned approximately $943,524 worth of Mattel stock.

28.     For the fiscal year ended December 31, 2018, Defendant Kreiz received $16,955,660 in compensation from the Company.  This included $1,027,397 in salary, $6,657,261 in stock awards, $6,506,946 in option awards, $2,695,384 in non-equity incentive plan compensation, and $68,672 in all other compensation.

29.     The Company's 2019 Proxy Statement stated the following about Defendant Kreiz:

Mr. Kreiz brings to Mattel's Board of Directors significant leadership, finance, multimedia, entertainment, and content experience. As a former Chief Executive Officer of a number of global media companies and a board member of Warner Music Group Corp., he brings a valuable perspective on the entertainment, digital, and media industries, including a focus on children's programming. He was also General Partner at Balderton Capital where he was active in early stage technology and media investments.

**Defendant Georgiadis**

30.     Defendant Margaret H. Georgiadis ("Georgiadis") served as the Company's CEO from February 2017 until she resigned on April 26, 2018.

31.     For the fiscal year ended December 31, 2017, Defendant Georgiadis received $31,275,289 in compensation from the Company.  This included $1,343,836 in salary, $1,500,000 in bonus, $20,264,391 in stock awards, $7,784,988 in option awards, and $382,074 in all other compensation.

32.     For the fiscal year ended December 31, 2018, Defendant Georgiadis received $3,790,949 in compensation from the Company.  This included $534,247 in salary, $3,203,365 in stock awards, and $53,337 in all other compensation.

33.     The Company's Schedule 14A filed with the SEC on May 17, 2018 (the "2018 Proxy Statement") stated the following about Defendant Georgiadis:

> Ms. Georgiadis brings to Mattel's Board significant experience in technology, marketing, consumer insights, e-commerce, finance, leadership, global business, strategy, and business development. She has proven ability to foster innovation, experience in building partnerships on a global scale, expertise in leading complex organizations, and experience in engaging consumers and retail partners in a rapidly evolving industry. She has successfully led efforts to deliver above market growth and profitability by creating transformational partnerships across content, media, and technology providers and through innovation in product development and customer engagement. At Google, Ms. Georgiadis led their commercial operations and advertising sales in the U.S., Canada, and Latin America and was responsible for driving Google's sales operations and strategies across regions, channels, and products. She also has over 15 years of analytical and strategic experience at the global management consulting firm of McKinsey & Company.

**Defendant Euteneuer**

34.     Defendant Joseph J. Euteneuer ("Euteneuer") has served as the Company's CFO since September 25, 2017.  On October 29, 2019, the Company announced that Defendant Euteneuer would leave the Company after a transition period of up to six months. On April 6, 2020, the Company announced that due to COVID-19, Euteneuer's tenure would be extended to an undetermined end date.  According to the 2019 Proxy Statement, as of March 22, 2019, Defendant Euteneuer beneficially owned 292,730 shares of the Company's common stock.  Given

that the price per share of the Company's common stock at the close of trading on March 22, 2019

was $13.21, Defendant Euteneuer owned over $3.86 million worth of Mattel stock.

35.     For the fiscal year ended December 31, 2017, Defendant Euteneuer received

$5,277,089 in compensation from the Company.  This included $241,644 in salary, $500,000 in

bonus, $2,586,570 in stock awards, $1,900,000 in option awards, and $48,875 in all other

compensation.

36.     For the fiscal year ended December 31, 2018, Defendant Euteneuer received

$5,341,577 in compensation from the Company.  This included $900,000 in salary, $2,070,588 in

stock awards, $674,999 in option awards, $1,431,000 in non-equity incentive plan compensation,

and $265,020 in all other compensation.

37.     The Company's 2019 Proxy Statement stated the following about Defendant

Euteneuer:

> **Mr. Euteneuer** has been Chief Financial Officer since September 2017. From May
> 2016 to September 2017, he served as Co-Chief Executive Officer and Chief
> Financial Officer of the Americas of Rivada Networks, LLC., a communications
> technology business. From April 2011 to August 2015, he served as Chief Financial
> Officer of Sprint Corporation, a wireless communications company. Mr. Euteneuer
> was Chief Financial Officer and Executive Vice President of Qwest
> Communications, a wireline telecom company, from 2008 to 2011. Before joining
> Qwest Communications, he served as Chief Financial Officer and Executive Vice
> President of XM Satellite Radio Holdings from 2002 to 2008. From 1988 to 2002,
> Mr. Euteneuer held several executive roles at Comcast Corporation, including
> Chief Financial Officer and Executive Vice President at Comcast Corporation's
> Business Communications/ Broadnet Europe from 2000 to 2002; and earlier, Vice
> President, Corporate Development, and Corporate Controller from 1988 to 2000.
> Prior to joining Comcast, he served as Chief Operating Officer of LaCanasta
> Mexican Foods International. Earlier in his career, Mr. Euteneuer held leadership
> roles at Deloitte and PricewaterhouseCoopers. He is a Certified Public Accountant.

**Defendant Johnson**

38.     Defendant Joseph B. Johnson ("Johnson") served as the Company's Senior Vice

President and Corporate Controller from May 2015 until he retired on August 10, 2018.

39.     The Company's May 4, 2015 press release announcing his appointment stated the following about Defendant Johnson:

> Mr. Johnson, age 52, joins Mattel from Chiquita Brands International, Inc., a leading global marketer and distributor of food products, where he served as Vice President, Chief Accounting Officer & Treasurer. Previously, Mr. Johnson held a number of leadership roles with Resolute Forest Products, an international wood and paper products company, including Senior Vice President, Finance and Chief Accounting Officer, Vice President and Corporate Controller and Director of Financial Reporting. Earlier in his career, Mr. Johnson spent nearly 14 years at Ernst & Young LLP. A certified public accountant, Mr. Johnson holds a bachelor's degree in business administration with an emphasis in accounting from the University of North Florida.

### Defendant Bradley

40.     Defendant R. Todd Bradley ("Bradley") has served as a Company director since May 17, 2018. He also serves as a member of the Audit Committee and Compensation Committee.

41.     For the fiscal year ended December 31, 2018, Defendant Bradley received $249,995 in compensation from the Company.  This included $110,000 in fees earned or paid in cash and $139,995 in stock awards.

42.     The Company's 2019 Proxy Statement stated the following about Defendant Bradley:

> Mr. Bradley brings to Mattel's Board significant leadership, finance, digital, marketing, and technology experience. As a prior Chief Executive Officer of a technology-driven company, he brings digital, marketing, and technology expertise relevant to Mattel's strategy, and management experience with logistics, production, and quality control with previous management positions within logistics, production, and quality control. In addition, Mr. Bradley has proven experience with turnaround companies in driving growth and improving profitably.

### Defendant Cisneros

43.     Defendant Adriana Cisneros ("Cisneros") has served as a Company director since August 13, 2018. She also serves as a member of the Governance and Social Responsibility Committee.

44.     For the fiscal year ended December 31, 2018, Defendant Cisneros received $200,003 in compensation from the Company.  This included $83,333 in fees earned or paid in cash and $116,670 in stock awards.

45.     The Company's 2019 Proxy Statement stated the following about Defendant Cisneros:

> Ms. Cisneros brings to Mattel's Board significant leadership, media, real estate, entertainment, consumer products, and digital experience. As the Chief Executive Officer of a global company, she has valuable expertise in restructuring, growth strategy, and technology. She has experience transforming a company through innovation and digital strategy. She also has experience serving on the boards of nonprofit entities. Ms. Cisneros also brings a valuable perspective on global consumers and corporate social responsibility.

**Defendant Dolan**

46.     Defendant Michael J. Dolan ("Dolan") has served as the Board's Independent Lead Director since January 2015 and as a Company director since 2004.  He also serves as Chair of the Compensation Committee, Chair of the Executive Committee, and as a member of the Governance and Social Responsibility Committee.  According to the 2019 Proxy Statement, as of March 22, 2019, Defendant Dolan beneficially owned 135,539 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2019 was $13.21, Defendant Euteneuer owned over $1.79 million worth of Mattel stock.

47.     For the fiscal year ended December 31, 2018, Defendant Dolan received $319,995 in compensation from the Company.  This included $165,000 in fees earned or paid in cash, $139,995 in stock awards, and $15,000 in all other compensation.

48.     The Company's 2019 Proxy Statement stated the following about Defendant Dolan:

> As a former Chief Executive Officer of a large global company, Mr. Dolan brings to Mattel's Board significant leadership, finance, global consumer products and branding, strategic marketing, and operations experience. Mr. Dolan also brings a valuable perspective on the entertainment industry through his experience as the

former Chief Executive Officer of IMG, which is important to Mattel since many of our most popular toys are derived from licensed entertainment properties. In addition, Mr. Dolan's long tenure with Young & Rubicam enables him to provide unique insights into brand building and advertising. Mr. Dolan has also gained valuable experience as the Chief Financial Officer of IMG, Viacom, and Young & Rubicam, where he dealt with complex accounting principles and judgments, internal controls, and financial reporting rules and regulations, and evaluated the financial results and financial reporting processes of large companies.

**Defendant Edwards**

49.     Defendant Trevor A. Edwards ("Edwards") served as a Company director from 2012 until he retired on May 17, 2018.

50.     For the fiscal year ended December 31, 2018, Defendant Edwards received $33,125 in compensation from the Company, which consisted entirely of gifts made by the Mattel Children's Foundation.

51.     The Company's 2018 Proxy Statement stated the following about Defendant Edwards:

> Mr. Edwards brings to Mattel's Board two decades of significant marketing and global brand management experience from a large public company. His leadership and strategy skills in overseeing geographic, category, direct-to-consumer business units globally, and all brand management functions, including digital and advertising, sports marketing, brand design, public relations, and retail marketing, provide a unique perspective on Mattel's key goals and strategies for growth. During his career at NIKE, Mr. Edwards led some of the brand's most significant break-through innovations, including spearheading the creation of NIKE+. In addition, he helped transform the digital landscape and position NIKE as a leader in the use of social media to connect with consumers globally.

**Defendant Fergusson**

52.     Defendant Frances D. Fergusson ("Fergusson") served as a Company director from 2006 until she retired on May 17, 2018.

53.     For the fiscal year ended December 31, 2018, Defendant Fergusson received $25,250 in compensation from the Company, which consisted entirely of gifts made by the Mattel Children's Foundation.

54.     The Company's Schedule 14A filed with the SEC on April 5, 2017 (the "2017 Proxy Statement") stated the following about Defendant Fergusson:

> As the former President of a major educational institution for 20 years, Dr. Fergusson brings to Mattel's Board her extensive general and financial management, leadership and strategic planning experience. At Vassar College, she headed strategic planning projects and strengthened the College's financial position. Dr. Fergusson also brings her experience serving on Boards of large, public companies and for-profit entities. Her service and leadership role with many non-profit entities also provide a unique perspective to the Board.

**Defendant Laursen**

55.     Defendant Soren T. Laursen ("Laursen") has served as a Company director since May 17, 2018, and as the Company's interim Executive Director since October 2018.  He also serves as a member of the Governance and Social Responsibility Committee and the Compensation Committee.  According to the 2019 Proxy Statement, as of March 22, 2019, Defendant Laursen beneficially owned 3,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2019 was $13.21, Defendant Laursen owned approximately $46,235 worth of Mattel stock.

56.     For the fiscal year ended December 31, 2018, Defendant Laursen received $389,161 in compensation from the Company.  This included $100,000 in fees earned or paid in cash, $239,997 in stock awards, and $49,164 in all other compensation.

57.     The Company's 2019 Proxy Statement stated the following about Defendant Laursen:

> Mr. Laursen brings to Mattel's Board of Directors significant leadership, finance, brand, marketing, retail, global, and toy industry experience. He has experience

successfully turning around a company and driving growth. As a former Chief Executive Officer of a toy retail company and former President of a toy manufacturer, he has tested experience and understanding of Mattel's business and the global commercial toy industry, deep expertise in developing strong brand franchises supported by compelling media, digital and technology activations, and leadership experience in successfully turning around a company and driving growth.

### Defendant Lewnes

58.     Defendant Ann Lewnes ("Lewnes") has served as a Company director since 2015. She also serves as Chair of the Governance and Social Responsibility Committee, and as a member of the Executive Committee.  According to the 2019 Proxy Statement, as of March 22, 2019, Defendant Lewnes beneficially owned 11,207 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2019 was $13.21, Defendant Lewnes owned approximately $148,044 worth of Mattel stock.

59.     For the fiscal year ended December 31, 2018, Defendant Lewnes received $269,995 in compensation from the Company.  This included $115,000 in fees earned or paid in cash, $139,995 in stock awards, and $15,000 in all other compensation.

60.     The Company's 2019 Proxy Statement stated the following about Defendant Lewnes:

As a global media and marketing leader in the technology industry, Ms. Lewnes brings to Mattel's Board her significant leadership experience in branding, advertising, technology, and financial management marketing. She also brings experience in driving strategic growth and global demand at two public technology companies, as well as her experience serving on the boards of nonprofit entities. At Adobe, Ms. Lewnes is responsible for Adobe's corporate brand, corporate communications, and integrated marketing efforts worldwide and has spearheaded the transformation of the company's global marketing efforts to be digital-first and data-driven. At Intel, Ms. Lewnes played a key role globally positioning the business and products to consumers, business professionals, and key computer channels.

### Defendant Loyd

61.     Defendant Kathy W. Loyd ("Loyd") served as a Company director from 2001 until she retired on May 17, 2018.

62.     For the fiscal year ended December 31, 2018, Defendant Loyd received $6,250 in compensation from the Company, which consisted entirely of gifts made by the Mattel Children's Foundation.

63.     The Company's 2018 Proxy Statement stated the following about Defendant Loyd:

> Given her experience as a professor of information technology, Chief Information Officer and an information management leader, Ms. White Loyd brings to Mattel's Board unique insights into the strategic use of information technology as a competitive advantage. Such experience as well as her public company director experience with a software provider make Ms. White Loyd an important contributor as information technology is an ever increasing important focus for Mattel.

**Defendant Lynch**

64.     Defendant Roger Lynch ("Lynch") has served as a Company director since August 13, 2018.   He also serves as a member of the Audit Committee and the Finance Committee. According to the 2019 Proxy Statement, as of March 22, 2019, Defendant Lynch beneficially owned 8,000 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on March 22, 2019 was $13.21, Defendant Lynch owned approximately $105,680 worth of Mattel stock.

65.     For the fiscal year ended December 31, 2018, Defendant Lynch received $215,003 in compensation from the Company.   This included $83,333 in fees earned or paid in cash, $116,670 in stock awards, and $15,000 in all other compensation.

66.     The Company's 2019 Proxy Statement stated the following about Defendant Lynch:

> Mr. Lynch brings to Mattel's Board significant leadership, media, technology, and internet experience. He has a wealth of consumer experience, including experience

leveraging changing consumer behaviors that can be applied to help further Mattel's growth. Additionally, he has extensive experience leading, innovating, and scaling consumer media and technology businesses globally, including having guided a number of companies through critical transformation periods. Through his media industry experience, Mr. Lynch has frequently worked with large content providers to create business models that embrace technological changes in distribution.

## Defendant Ng

67.     Defendant Dominic Ng ("Ng") has served as a Company director since 2006.  He also serves as the Chair of the Finance Committee, and as a member of the Audit Committee and the Executive Committee.  According to the 2019 Proxy Statement, as of March 22, 2019, Defendant Ng beneficially owned 9,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2019 was $13.21, Defendant Ng owned approximately $125,495 worth of Mattel stock.

68.     For the fiscal year ended December 31, 2018, Defendant Ng received $279,995 in compensation from the Company.  This included $125,000 in fees earned or paid in cash, $139,995 in stock awards, and $15,000 in all other compensation.

69.     The Company's 2019 Proxy Statement stated the following about Defendant Ng:

As the Chief Executive Officer of one of the largest independent banks headquartered in Southern California, Mr. Ng brings to Mattel's Board significant experience in leadership, strategy, business development, and global business. He also has valuable experience in dealing with complex accounting principles and judgments, internal controls, and financial reporting rules and regulations, and evaluating financial results and financial reporting processes of large companies. Mr. Ng transformed East West Bank from a small savings and loan association based in Los Angeles into a large full service commercial bank with exclusive focus on the United States and Greater China markets. Mr. Ng's extensive experience conducting business in China is extremely valuable to Mattel because of Mattel's large manufacturing presence in China and emerging markets initiatives (including China). He also brings to Mattel's Board extensive business and governmental relationships in the State of California and the greater metropolitan area of Los Angeles, where Mattel is headquartered.

## Defendant Olian

70.     Defendant Judy D. Olian ("Olian") has served as a Company director since September 13, 2018.  She also serves as a member of the Compensation Committee and the Governance and Social Responsibility Committee.

71.     For the fiscal year ended December 31, 2018, Defendant Olian received $195,005 in compensation from the Company.  This included $75,000 in fees earned or paid in cash, $105,005 in stock awards, and $15,000 in all other compensation.

72.     The Company's 2019 Proxy Statement stated the following about Defendant Olian:

As the President of Quinnipiac University, and former Dean of the UCLA Anderson School of Management for over 12 years, Dr. Olian brings to Mattel's Board her extensive human resource management, management composition, and management systems expertise. Under her leadership, the Anderson School hired a record number of faculty, and raised over $450 million for student and faculty support and to create innovative programming. Her tenure as Dean also saw the expansion of the school's Board of Advisors, attracting many prominent business leaders who represent diverse functional and global perspectives, as well as the creation of the school's Master of Financial Engineering and Master of Science in Business Analytics programs.

**Defendant Prabhu**

73.     Defendant Vasant M. Prabhu ("Prabhu") has served as a Company director since 2007.  He also serves as Chair of the Audit Committee, and as a member of the Executive Committee and the Finance Committee.  According to the 2019 Proxy Statement, as of March 22, 2019, Defendant Prabhu beneficially owned 38,921 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2019 was $13.21, Defendant Prabhu owned approximately $514,146 worth of Mattel stock.

74.     For the fiscal year ended December 31, 2018, Defendant Prabhu received $284,995 in compensation from the Company.  This included $130,000 in fees earned or paid in cash, $139,995 in stock awards, and $15,000 in all other compensation.

75. The Company's 2019 Proxy Statement stated the following about Defendant Prabhu:

> As Chief Financial Officer of a number of large public companies, Mr. Prabhu brings to Mattel's Board significant leadership experience dealing with complex accounting principles and judgments, internal controls, and financial reporting rules and regulations, and evaluating financial results and financial reporting processes of large companies. As Senior Vice President Finance & Chief Financial Officer of Pepsi International, Mr. Prabhu was responsible for the company's franchise and had oversight of operations in more than 100 countries. His global management, retail, and finance experience are also important to Mattel, given Mattel's significant international operations.

**Defendant Scarborough**

76. Defendant Dean A. Scarborough ("Scarborough") served as a Company director from 2007 until he retired on May 17, 2018.

77. The Company's 2017 Proxy Statement stated the following about Defendant Scarborough:

> As a currently-serving Executive Chairman and former Chief Executive Officer of a large public company, Mr. Scarborough brings to Mattel's Board deep leadership, brand building, strategy, business development, finance, global consumer products and operations experience. He has extensive experience in retail and distribution channels, enabling Mr. Scarborough to provide valuable perspective and insights in these areas.

**Defendant Sinclair**

78. Defendant Christopher A. Sinclair ("Sinclair") served as the Executive Chairman of the Board from February 2017 until May 2018. He previously served as a Company director from 1996. He also formerly served as the Company's CEO from April 2015 to February 2017, at which point he "resigned" from his position and took on the role of Executive Chairman of the Board.

79.    For the fiscal year ended December 31, 2017, Defendant Sinclair received $3,665,628 in compensation from the Company.  This included $1,052,055 in salary, $1,346,880 in stock awards, and $266,691 in all other compensation.

80.    For the fiscal year ended December 31, 2018, Defendant Sinclair received $564,956 in compensation from the Company.  This included $164,864 in stock awards, and $400,092 in all other compensation.

81.    The Company's 2018 Proxy Statement stated the following about Defendant Sinclair:

> **Mr. Sinclair** has been Executive Chairman of the Board since February 2017. From April 2015 to February 2017, he served as Chief Executive Officer, and from January 2015 to February 2017, he also served as Chairman of the Board of Mattel. He served as Interim Chief Executive Officer from January 2015 to April 2015. Prior to assuming the role of Chairman of the Board and Interim Chief Executive Officer, Mr. Sinclair served as the Independent Lead Director, Chairman of the Audit Committee and Chairman of the Executive Committee since 2011. From May 2002 until his retirement in July 2008, he served as Executive Chairman of Scandent Holdings, an information technology investment company. From August 2005 to January 2009, he also served as Executive Chairman of Cambridge Solutions Corporation Ltd., a leader in providing information technology and business process outsourcing services. He served as a Managing Director of Manticore Partners, LLC, a venture capital advisory firm, from June 2000 to June 2005, as an Operating Partner of Pegasus Capital Advisors, LP, a private equity firm, from February 2000 to August 2002, and as Chairman of the Board and Chief Executive Officer of Caribiner International, Inc. from December 1998 to May 2000. Prior to that, he served as President and Chief Executive Officer of Quality Food, Inc., Chairman and Chief Executive Officer of Pepsi-Cola Company, and President and Chief Executive Officer of PepsiCo Foods & Beverages International and Pepsi-Cola International for more than five years.

### Defendant PwC

82.    PwC is a multinational professional services network headquartered in the United Kingdom, and has served as the Company's independent registered accounting firm since 1974. As Mattel's independent auditor, PwC is responsible for auditing the Company's financial statements and certifying that the Company has maintained effective internal controls.

83.    For the fiscal year ended December 31, 2017, Mattel accrued $9,408,000 in fees for audit and non-audit services provided by Defendant PwC. This included $7,764,000 in audit fees for professional services provided in connection with the integrated audit of Mattel's annual consolidated financial statements and the audit of internal control over financial reporting, among other things, $143,000 in audit-related fees consisting primarily of fees related to audits of employee benefit plans, and $1,501,000 in tax fees.

84.    For the fiscal year ended December 31, 2018, Mattel accrued $9,406,000 in fees for audit and non-audit services provided by Defendant PwC. This included $7,986,000 in audit fees for professional services provided in connection with the integrated audit of Mattel's annual consolidated financial statements and the audit of internal control over financial reporting, among other things, $193,000 in audit-related fees consisting primarily of fees related to audits of employee benefit plans, and $1,227,000 in tax fees.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

85.    By reason of their positions as officers, directors, and/or fiduciaries of Mattel and because of their ability to control the business and corporate affairs of Mattel, the Individual Defendants owed Mattel and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Mattel in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Mattel and its shareholders so as to benefit all shareholders equally.

86.    Each director and officer of the Company owes to Mattel and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

87.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Mattel, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

88.     To discharge their duties, the officers and directors of Mattel were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

89.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Mattel, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Mattel's Board at all relevant times.

90.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Amended Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

91.     To discharge their duties, the officers and directors of Mattel were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Mattel were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Mattel's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Mattel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Mattel and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Mattel's operations would comply with all applicable laws and Mattel's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

92.     Each of the Individual Defendants further owed to Mattel and the shareholders the duty of loyalty requiring that each favor Mattel's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

93.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Mattel and were at all times acting within the course and scope of such agency.

94.     Because of their advisory, executive, managerial, and directorial positions with Mattel, each of the Individual Defendants had access to adverse, non-public information about the Company.

95.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Mattel.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

96.     In committing the wrongful acts alleged herein, the Individual Defendants and PwC have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   The Individual Defendants and PwC caused the Company to conceal the true facts as alleged herein.   The Individual Defendants and PwC further aided and abetted and/or assisted each other in breaching their respective duties.

97.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

98.     The Individual Defendants and PwC accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and PwC collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of

Mattel was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

99.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

100.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Mattel, and was at all times acting within the course and scope of such agency.

## MATTEL'S CODE OF CONDUCT

101.    Pursuant to the Company's Code of Conduct, all employees are expected to comply with the Code of Conduct, Company policies, and laws that govern the Company's activities. Additionally, certain of the provisions of the Code of Conduct apply to members of the Board.

102.    The Code of Conduct provides, as to "Conflicts of Interest," that:

A conflict of interest arises any time our personal interests might affect our judgment as to what is in the best interest of Mattel, or make it difficult to perform our work for Mattel objectively and effectively. Employees and Directors must act in the best interests of Mattel, without considering personal interests or the potential for personal benefit.

It is the responsibility of each Covered Employee to promptly bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, each Covered Employee shall promptly bring to the attention of the Disclosure Committee and the Internal Audit function, any information the employee may have concerning (a) deficiencies or weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information

or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

103. The Code of Conduct provides, as to "Protecting Mattel's Assets," that:

All employees and Directors share in the responsibility to protect Mattel's assets (including physical assets, financial assets, intellectual property and confidential information) from theft, loss, damage, misuse or waste. Employees who use company property, such as vehicles and laptop computers, should take appropriate measures to ensure their proper security and use. Company assets should not be used for illegal purposes, or for personal benefit (except as may be allowed in companyapproved compensation arrangements). Incidental personal use of company assets, such as telephones, personal computers and photocopying machines, is permitted as long as such use does not interfere with the employee's duties, is not done for monetary gain, does not conflict with Mattel's business and does not violate any Mattel Policy or applicable law.

104. The Code of Conduct provides, as to "Accuracy of Company Records, Public Reports and Communications," that:

Mattel is committed to provide full, fair, complete, accurate, timely and understandable disclosure of information, including financial information, in reports filed with the Securities and Exchange Commission and in other public communications, in accordance with applicable laws, rules and regulations.

Financial books, records and accounts must be maintained in reasonable detail, accurately reflect transactions and events, and conform to applicable legal and accounting requirements and to Mattel's system of internal controls. In order to fulfill our responsibility for sound decision-making, we require honest and accurate recording and reporting of business information and transactions, including quality, safety and personnel data records, as well as financial transactions and records.

Falsification of any record or financial report, such as quality and safety data, time reports or expense reports, will result in immediate disciplinary action.

See the "How to Get Help and Raise Concerns" section for information about procedures for raising concerns about accounting and auditing matters.

105. The Code of Conduct provides, as to "Our Responsibility to Government and Compliance with the Law," that:

Employees and Directors must comply with the laws, rules and regulations wherever Mattel does business.

Every employee has a responsibility to understand the law and the Code as it applies to his or her job. Any employee who has a question or concern about the legality of an action should contact the Law Department for advice.

**Which Law Applies?**

Mattel, Inc. is incorporated in the United States. The laws of the United States often extend to Mattel's operations throughout the world, and to the business activities of Mattel's employees wherever we live and work.

As a global company, Mattel's operations may be regulated by many different laws at the same time. There may be a conflict between the applicable laws of two or more countries. Any employee who thinks there may be a conflict should ask the Law Department for advice.

The Code of Conduct is intended to promote compliance with the laws and regulations that apply to Mattel's business. However, if we find that compliance with the Code of Conduct might cause us to violate the law, we must obey the law and ask the Law Department for advice as soon as possible. On the other hand, if following any local business custom or practice would cause us to violate the Code of Conduct, we must comply with the Code of Conduct and notify our supervisors of the conflict.

106.    The Code of Conduct provides, as to "Taking Action to Correct Problems," that:

Taking action to correct problems is part of the Mattel culture.

Mattel provides a number of resources that employees can use to raise ethical concerns or report potential violations. If you observe conduct that you believe may be unethical, illegal or in violation of the Code of Conduct or Company Policies, you should report your concerns to your supervisor, the Human Resources Department, the Law Department, the Internal Audit Department, the Global Security Department or the confidential EthicsLine.

All reported concerns will be handled promptly, fairly and discreetly. Employees must cooperate fully with any investigation that Mattel undertakes and must answer truthfully any questions that are asked as part of the investigation.

107.    The Code of Conduct provides, as to "Raising Concerns or Complaints About Accounting or Auditing Matters," that:

Any employee may submit a good faith concern or complaint regarding accounting, internal accounting controls or auditing matters to Mattel, without fear of retaliation of any kind, in any of the following ways (these are general complaint procedures and may vary from country to country due to local laws and regulations):

- Contact an Officer: Employees with complaints regarding accounting, internal accounting controls or auditing matters may report their complaints to the General Counsel or Vice President – Audit, in writing, by phone or via e-mail.
- Employee complaints submitted in writing or by telephone may be made on a confidential and anonymous basis. Due to technical constraints, e-mail submissions may not be made anonymously.
- Call the EthicsLine: Mattel's EthicsLine permits employees to report complaints regarding accounting, internal accounting controls or auditing matters and other matters confidentially and anonymously.

108.   In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in improper accounting methods, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' and PwC's violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, and aiding and abetting thereof.   Moreover, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, maintain the "accuracy of company records, public reports and communications," and uphold the employee and director responsibilities related thereto.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

109.   Mattel is one of the largest toy-manufacturers and children's entertainment company in the world. The Company designs, manufactures, and markets toy products that are sold globally to Mattel's customers and directly to consumers.   The Company's portfolio of brands and products are divided into four major brand categories: (1) Mattel Girls & Boys Brands (including popular brands such as Barbie® fashion dolls and Hot Wheels®); (2) Fisher-Price Brands (including popular brands such as Thomas & Friends® and Mickey Mouse®); (3) American

Girl Brands; and (4) Construction and Arts & Crafts Brands.  The Company "believes its products are among the most widely recognized toy products in the world."

110.    The Company's operating segments, which are separately managed business units, consist of: (1) North America; (2) International; and (3) American Girl.  A relatively small retail customer base accounts for a majority of the Company's products sales.  In fact, direct sales to United States and Canadian retailers account for approximately half of the Company's gross revenue.  Wal-Mart Stores, Inc., Target Corporation, and Toys "R" Us, Inc. collectively accounted for approximately 39% of Mattel's net revenue in the fiscal year ended December 31, 2016.  The majority of Mattel's retail sales occur between September and December.

111.    In the years leading up the beginning of the Relevant Period, the Company was underperforming its peers, regularly reporting lower revenues each year since 2013. In 2015, its operating profit margin declined nearly 50% to 9.5% due, in large part, to deteriorating sales and gross margins, higher promotional spending levels, and the Company's products failing to resonate with its customer base. That same year, Mattel lost its highly lucrative Disney Princesses license to Hasbro, Inc., one of Mattel's chief competitors.

112.    Subsequently, over two-thirds of the Company's senior executives were either fired or resigned, and the Company appointed a new CEO, who ultimately lasted two years before being replaced by Defendant Georgiadis in February 2017. During the first half of 2017, the Company fell short of analyst expectations, reporting revenue of $975 million in the second quarter and a loss of $0.14 per share, compared to analyst estimates of $982 million and a loss of $0.09 per share. The Company's bleak prospects continued throughout Defendant Georgiadis's tenure as CEO; for instance, on September 19, 2017, Toys "R" Us, Inc., which accounted for 15 to 20%

of the Company's U.S. sales, went bankrupt. After only 14 months at the Company's helm, Defendant Georgiadis was replaced by Defendant Kreiz.

113.    In light of the significant challenges facing Mattel, the Company's financial results, and especially the Company's net loss, which had ballooned to as high as $169.3 million during the first half of 2017, were of particular importance to investors as a gauge of the Company's profitability. The Company's weak performance brought numerous downgrades by analysts. Following the Toys "R" Us bankruptcy, the Company's revenue had dropped 22% for its sales in North America by the end of the third quarter ended September 30, 2017, compared to the prior year, and the Company's international revenue was stagnant.

### False and Misleading Statements

#### August 2, 2017 Form 10-Q

114.    On August 2, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2017 with the SEC (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendant Johnson, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Georgiadis and non-party Kevin M. Farr attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

115.    In its section titled, "Controls and Procedures," the 2Q17 10-Q stated the following:

As of June 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and

Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2017.

* * *

During the quarter ended June 30, 2017, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

### September 21, 2017 Form 8-K

116.    On September 21, 2017, the Company filed a current report on Form 8-K with the SEC announcing that the Company had amended its Credit Facility, which among other things, provided for loan concessions that lessened certain requirements the Company would have to meet to remain in compliance with the terms of the Credit Facility.

### October 3, 2017 Form S-3

117.    On October 3, 2017, the Company filed a registration statement and prospectus on Form S-3 (the "October 2017 Form S-3") with the SEC, which provided for future offerings of debt, warrants, and other securities. The October 2017 Form S-3 was signed by Defendants Kreiz, Georgiadis, Euteneuer, Johnson, Sinclair, Dolan, Edwards, Fergusson, Lewnes, Loyd, Ng, Prabhu, Scarborough, and non-party Dirk Van de Put, and incorporated by reference the positive evaluation of the Company's internal controls included in the 2Q17 10-Q, and in the Company's annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"), previously filed with the SEC on February 23, 2017.

118.    The October 2017 Form S-3 also included as an exhibit a statement signed by PwC consenting to the October 2017 Form S-3's incorporation of the positive internal control evaluation contained in the 2016 10-K.

119.    The statements referenced above in ¶¶ 114–118 were materially false and misleading because they failed to accurately reflect the true state of the Company's financial condition and operations. The loan concessions specifically identified above were thus based on inflated financial results. These statements were made while material and undisclosed weaknesses existed in the Company's internal controls, which were therefore rendered ineffective.

### *October 26, 2017 Form 10-Q*

120.    On October 26, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2017 with the SEC (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendant Johnson, and contained SOX certifications signed by Defendants Georgiadis and Euteneuer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

121.    With respect to the Company's financial and operating results, the 3Q17 10-Q stated the following, in relevant part:

> [I]n the third quarter Mattel established a valuation allowance on its U.S. federal and state deferred tax assets. This results in a discrete non-cash charge to the quarter of $561.9 million for the balance of these net deferred tax assets as of December 31, 2016.

> \* \* \*

> Net loss for the third quarter of 2017 was $603.2 million, or $1.75 per diluted share, as compared to net income of $236.3 million, or $0.68 per diluted share, in the third quarter of 2016. Net loss for the third quarter of 2017 was negatively impacted by discrete non-cash tax expense of $561.9 million related to the establishment of a valuation allowance on deferred tax assets that will likely not be realized and lower gross profit.

122.    In its section titled, "Controls and Procedures," the 3Q17 10-Q stated the following:

> As of September 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing

reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2017.

\* \* \*

During the quarter ended September 30, 2017, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

123.    The statements referenced above in ¶¶ 120–122 were materially false and misleading because they failed to disclose that: (1) Mattel did not maintain effective internal controls over financial reporting; and (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million.

### February 27, 2018 Form 10-K

124.    On February 27, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Kreiz, Georgiadis, Euteneuer, Johnson, Sinclair, Dolan, Edwards, Fergusson, Lewnes, Loyd, Ng, Prabhu, and Scarborough, and contained SOX certifications signed by Defendants Georgiadis and Euteneuer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

125.    With respect to the Company's financial and operating results, the 2017 10-K reported a net loss for the fiscal quarter ended December 31, 2017 of $281.3 million, and made the

same representations with respect to tax valuation allowance for the fiscal quarter ended September 30, 2017 as reported in the 3Q17 10-Q.

126.    In its section titled, "Controls and Procedures," the 2017 10-K stated the following:

As of December 31, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of December 31, 2017.

\* \* \*

There was no change in our internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

127.    The 2017 10-K included a "Management's Report on Internal Control over Financial Reporting," which stated the following:

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Mattel's management, including Margaret H. Georgiadis, its principal executive officer, and Joseph J. Euteneuer, its principal financial officer, evaluated the effectiveness of Mattel's internal control over financial reporting using the framework in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this evaluation, management concluded that Mattel's internal control over financial reporting was effective as of December 31, 2017. The effectiveness of the Company's internal control over financial reporting as of December 31, 2017 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

128.    The 2017 10-K also contained PwC's report on its audit of the Company's financial statements, which stated the following, in relevant part:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the COSO.

* * *

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

129.    Notably, according to Whitaker, by this point, shortly after the start of 2018, the material accounting error had been identified and reported to senior management, who continued to misrepresent the effectiveness of the Company's internal controls with the help of Defendant PwC.

### April 5, 2018 Proxy Statement

130.    On April 5, 2018, the Company filed the 2018 Proxy Statement with the SEC. Defendants Kreiz, Georgiadis, Bradley, Dolan, Edwards, Laursen, Lewnes, Ng, and Prabhu solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

131.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[o]ur Board has adopted a Code of Conduct, which is a general statement of Mattel's standards

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

of ethical business conduct. The Code of Conduct applies to all of our employees, including our CEO and our CFO. Certain provisions of the Code of Conduct also apply to members of the Board in their capacity as Mattel's directors."

132.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

133.    Additionally, the 2018 Proxy Statement called for shareholder approval of, among other things, ratification of PwC as the Company's independent public accounting firm for the year ended December 31, 2018, and an amendment to the Company's Amended and Restated 2010 Equity and Long-Term Compensation Plan (the "2010 Long-Term Compensation Plan"), which would authorize the Company to reserve an additional 13 million shares of Company stock to be issued to the Company's executive officers and directors in the form of annual equity award grants.

134.    The 2018 Proxy Statement also called for stockholders to reject a stockholder proposal regarding an independent Board Chairman. Specifically, the proposal called for the Company's governing documents to be amended as necessary to require, whenever possible, that the Chairman of the Board be an independent director.

135.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As

a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes Offering and restate certain of its financial statements.

136.    Also as a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders approved the ratification of PwC and the amendment to the 2010 Long-Term Compensation Plan, and rejected the stockholder proposal regarding an independent Board Chairman.

### *April 26, 2018 Form 10-Q*

137.    On April 28, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendant Johnson, and contained SOX certifications signed by Defendants Georgiadis and Euteneuer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

138.    In its section titled, "Controls and Procedures," the 1Q18 10-Q stated the following:

As of March 31, 2018, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of March 31, 2018.

* * *

During the quarter ended March 31, 2018, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

### *July 25, 2018 Form 10-Q*

139.    On July 25, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2018 with the SEC (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendant Johnson, and contained SOX certifications signed by Defendants Kreiz and Euteneuer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

140.    In its section titled, "Controls and Procedures," the 2Q18 10-Q stated the following:

As of June 30, 2018, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2018.

                                        * * *

During the quarter ended June 30, 2018, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

### *October 25, 2018 Form 10-Q*

141.    On October 25, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant Euteneuer, and contained SOX certifications signed by Defendants Kreiz and

Euteneuer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

142.    In its section titled, "Controls and Procedures," the 3Q18 10-Q stated the following:

As of September 30, 2018, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2018.

* * *

During the quarter ended September 30, 2018, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

***February 22, 2019 Form 10-K***

143.    On February 22, 2019, the Company filed the 2018 10-K. The 2018 10-K was signed by Defendants Kreiz, Euteneuer, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu, and contained SOX certifications signed by Defendants Kreiz and Euteneuer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

144.    The 2018 10-K contained financial data for the fiscal quarters ended September 30, 2017 and December 31, 2017, which contained the same tax valuation allowance error for the fiscal quarter ended September 30, 2017 as reported in the 3Q17 10-Q and in the 2017 10-K.

145.     In its section titled, "Controls and Procedures," the 2018 10-K stated the following:

As of December 31, 2018, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of December 31, 2018.

* * *

There was no change in our internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

146.     The 2018 10-K included a "Management's Report on Internal Control over Financial Reporting," which stated the following:

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Mattel's management, including Ynon Kreiz, its principal executive officer, and Joseph J. Euteneuer, its principal financial officer, evaluated the effectiveness of Mattel's internal control over financial reporting using the framework in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this evaluation, management concluded that Mattel's internal control over financial reporting was effective as of December 31, 2018. The effectiveness of the Company's internal control over financial reporting as of December 31, 2018 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

147.     The 2018 10-K also contained PwC's report on its audit of the Company's financial statements, which stated the following, in relevant part:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity

with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the COSO.

\* \* \*

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

### April 4, 2019 Proxy Statement

148.    On April 4, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Kreiz, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

149.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[t]he Board has adopted a Code of Conduct, which is a general statement of Mattel's standards of ethical business conduct. The Code of Conduct applies to all of our employees, including our CEO and CFO. Certain provisions of the Code of Conduct also apply to members of the Board in their capacity as Mattel's directors."

150.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

151.    Additionally, the 2019 Proxy Statement called for shareholder approval of, among other things, ratification of PwC as the Company's independent registered public accounting firm for the year ended December 31, 2019, and a second amendment to the 2010 Long-Term Compensation Plan, which would authorize the Company to reserve an additional 14 million shares of Company stock to be issued to the Company's executive officers and directors in the form of annual equity award grants.

152.    The 2019 Proxy Statement also called for stockholders to reject a stockholder proposal regarding an amendment to stockholder proxy access provisions. Specifically, the proposal called for the Company's bylaws to be amended to provide that stockholder proxy access director candidates need not obtain a specific percentage vote in order to qualify as proxy access director candidates at any shareholder meeting.

153.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes Offering and restate certain of its financial statements.

154.    Also as a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders approved the ratification of PwC and the amendment to the 2010 Long-Term Compensation Plan and rejected the stockholder proposal regarding proxy access provisions.

### April 26, 2019 Form 10-Q

155.    On April 26, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Euteneuer, and contained SOX certifications signed by Defendants Kreiz and Euteneuer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

156.    In its section titled, "Controls and Procedures," the 1Q19 10-Q stated the following:

As of March 31, 2019, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of March 31, 2019.

* * *

There was no change in our internal control over financial reporting that occurred during the period of this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. We implemented internal controls to ensure we adequately assessed the adoption impact of the new lease standard, and its related amendments, on our financial statements. There were no significant changes to our internal control over financial reporting due to the adoption of the new standard.

*July 26, 2019 Form 10-Q*

157.     On July 26, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 with the SEC (the "2Q19 10-Q"). The 2Q19 10-Q was signed by non-party Yoon Hugh, and contained SOX certifications signed by Defendants Kreiz and Euteneuer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

158.     In its section titled, "Controls and Procedures," the 2Q19 10-Q stated the following:

As of June 30, 2019, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2019.

\* \* \*

During the three months ended June 30, 2019, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

159.     The statements referenced above in ¶¶ 124-128, 137-147, and 155-158 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, finances, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material

fact that failed to disclose, *inter alia*, that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes Offering and restate certain of its financial statements.

### The Truth Begins to Emerge

*August 1, 2019 Press Release*

160.   On August 1, 2019, the Company issued a press release announcing the Notes Offering, through which the Company intended to offer $250 million in senior notes due 2027, which would be used to redeem and retire the Company's senior notes due 2020. The Company indicated that the Notes Offering was expected to close on August 8, 2019.

*August 8, 2019 Form 8-K*

161.   On August 8, 2019, the day that the Notes Offering was expected to close, the Company issued a current report on Form 8-K announcing that two days prior, that Company had become aware of an anonymous whistleblower letter. The letter, which had been sent to PwC, described accounting errors in the Company's previously filed financial statements, and questioned PwC's independence As a result, in order to provide the Company with time to investigate the allegations set forth in the whistleblower letter, the Notes Offering had been terminated. The Form 8-K stated the following, in relevant part:

On August 6, 2019, Mattel, Inc. (the "Company") was made aware of an anonymous whistleblower letter. To provide the Company with an opportunity to investigate the matters set forth in the letter, the offering of the Company's 6.00% Senior Notes due 2027 that was scheduled to close on August 8, 2019 has been terminated. The Company intends to refinance its 4.350% Senior Notes due October 2020 prior to maturity.

162.    On this news, the price of the Company's stock plunged by over 15%, from $13.43 per share at the close of trading on August 8, 2019, to $11.31 per share at the close of trading on August 9, 2019, on heavy trading volume.

163.    Analysts recognized the gravity of the sudden cancellation of the Notes Offering. For instance, a UBS analyst commenting on the cancellation stated, "for Mattel management and the company's bankers to make a decision to pull out of the bond market, the issue at hand must have been important."

**Subsequent Developments**

***October 29, 2019 Press Releases***

164.    On October 29, 2019, the Company issued three press releases. One of the press releases, titled "Mattel Completes Internal Investigation of Whistleblower Letter and Announces Remedial Actions" revealed that the Company's Audit Committee had concluded an internal investigation into the whistleblower letter. The investigation had uncovered material weaknesses in the Company's internal controls, necessitating, among other things, prospective revisions to certain of the Company's financial statements, and requiring that the 2018 10-K be restated. The press release stated the following, in relevant part:

> [The Company] announced today that the Audit Committee of its Board of Directors has completed an independent investigation into the allegations contained in a whistleblower letter disclosed on August 8, 2019 (the "Letter").
>
> * * *
>
> ***The investigation determined that income tax expense was understated by $109 million in the third quarter of 2017, and overstated by $109 million in the fourth***

48

*quarter of 2017, with no impact for the full year*. The errors were non-cash, did not affect operating income or EBITDA, and had no impact on Mattel's full year financial results for 2017 or subsequent periods. ***The investigation also determined that Mattel has certain material weaknesses in its internal control over financial reporting.***

The Audit Committee concluded that the objectivity and impartiality of Mattel's outside auditor has not been impaired, and that Mattel's outside auditor can continue as its independent auditor. Mattel's outside auditor agrees with that conclusion.

***Mattel will undertake a series of remedial actions, including the amendment of the Company's 2018 Form 10-K to restate the last two quarters of 2017, and certain related information, and the strengthening of its internal control over financial reporting.***

\* \* \*

***The Audit Committee's investigation found errors in publicly-filed Mattel financial statements for the last two quarters of 2017, failures to properly consider and disclose such errors to the then-Chief Executive Officer ("CEO"), Margaret Georgiadis, and the Audit Committee once they became known, and violations of auditor independence rules***. Other allegations in the Letter were determined to be unfounded or immaterial.

\* \* \*

Mattel has been and is continuing to work on addressing the issues identified in the Audit Committee's investigation.

First, Mattel, in consultation with the Audit Committee, determined that it is appropriate to amend the Company's 2018 Annual Report on Form 10-K to: (1) restate the Company's financial results for the third and fourth quarters of 2017 and certain related information; and (2) identify material weaknesses in its internal control over financial reporting for the third and fourth quarters of 2017. Mattel has discussed the restatements with its outside auditor and is working diligently to prepare and file the amended report by November 12, 2019. ***Investors should no longer rely upon Mattel's previously released financial statements and internal control conclusions for the third and fourth quarters of 2017. Similarly, related press releases, earnings releases, and investor communications describing Mattel's financial statements for these periods should no longer be relied upon.***

(Emphasis added.)

165.     The press release also indicated that the internal control failures were in part due to "lapses in judgment by management," and "management's reliance on the accounting advice

sought and received on the error from the lead audit engagement partner of Mattel's outside auditor." As a result, the Company had initiated a search for a new CFO to replace Defendant Euteneuer.

### *November 6, 2019 Wall Street Journal Article*

166.    On November 6, 2019, *The Wall Street Journal* published an article providing the account of Whitaker, a former director of tax reporting who resigned from Mattel after becoming aware that senior accounting executives at the Company had deliberately concealed the tax valuation error that led to the internal control deficiencies. According to Whitaker, accounting executives had identified the error and believed they were required to disclose it, but instead chose to conceal the material error by changing the categorization of Mattel's Thomas & Friends® asset in the Company's financial statements. Whitaker stated that "[i]t was known within Mattel that if we took this approach, at worst we might get a slap on the wrist from the [SEC]." Whitaker further revealed that a senior accounting executive had told him that if the Company disclosed a material weakness in its internal controls, it would be "the kiss of death."

167.    The article further provided that PwC had actively worked with Mattel executives to conceal the material weaknesses in the Company's internal controls. The article quoted Whitaker as stating that "[a] PwC partner told me that they were looking for a way to say this isn't a material weakness," and that after PwC and Company executives had determined not to disclose the tax valuation error, a PwC partner was seen "walking down the hall, high-fiving people."

### *November 8, 2019 Bloomberg Article*

168.    On November 8, 2019, *Bloomberg* published an article revealing to the public that PwC had become the subject of an investigation by the PCAOB, and that the PwC partner in charge

of Mattel's audit team was placed on administrative leave. The article stated the following, in relevant part:

> Accounting giant PwC's work for Mattel Inc. is being reviewed by the top U.S. audit watchdog after the toymaker said it would restate some previous financial results because of a bookkeeping error, according to a person familiar with the matter.
>
> The Public Company Accounting Oversight Board's scrutiny comes after Mattel said last week that some financial statements from 2017 "should no longer be relied upon due to material misstatements." The El Segundo, California-based company, which makes Barbie dolls and Matchbox cars, also said on Oct. 29 that it found "material weaknesses" in its internal controls for financial reporting.
>
> * * *
>
> The partner overseeing the Mattel audits has been placed on administrative leave by PwC, according to another person who requested anonymity to discuss internal matters. Mattel said in its Oct. 29 filing with the SEC that its chief financial officer would be leaving the company.

**February 25, 2020 Form 10-K**

169.    Lastly, on February 25, 2020, the Company filed the 2019 10-K with the SEC. The 2019 10-K revealed that during December 2019, the Company had received a subpoena from the SEC, as well as requests for information from the U.S. Attorney's Office for the Southern District of New York relating to the whistleblower letter and the Company's investigation. The 2019 10-K stated the following, in relevant part:

> Mattel also received a subpoena in December 2019 from the SEC, seeking documents related to the whistleblower letter and subsequent investigation, and is responding to the SEC's subpoena. Mattel is also responding to requests from the United States Attorney's Office for the Southern District of New York ("SDNY") related to this matter. Mattel cannot predict the eventual scope, duration or outcome of potential legal action by the SEC or SDNY, if any, or whether any such action could have a material impact on Mattel's financial condition, results of operations or cash flows.

<u>Repurchases</u>

170.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the

Company spent an aggregate amount of over $23.2 million to repurchase approximately 1.47 million shares[5] of its own common stock at artificially inflated prices.

171.     According to the 3Q17 10-Q, during August 2017, the Company purchased 289,305 shares of its common stock for approximately $5.65 million, at an average price of $19.56 per share.

172.     As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during August 2017 was approximately $2.38 million.

173.     According to the 3Q17 10-Q, during September 2017, the Company purchased 48,922 shares of its common stock for approximately $752,909, at an average price of $15.39 per share.

174.     As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during September 2017 was approximately $199,602.

175.     According to the 2017 10-K, during the three month period ended December 31, 2017, the Company purchased 75,831 shares of its common stock for approximately $1.12 million, at an average price of $14.80 per share.

176.     As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during the three month period ended December 31, 2017 was approximately $264,650.

---

[5] According to the Company, these shares represent "shares withheld from employees to satisfy minimum tax withholding obligations that occur upon vesting of restricted stock units."

177.    According to the 1Q18 10-Q, during the three month period ended March 31, 2018, the Company purchased 103,456 shares of its common stock for approximately $1.63 million, at an average price of $15.79 per share.

178.    As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during the three month period ended March 31, 2018 was approximately $463,483.

179.    According to the 2Q18 10-Q, during the three month period ended June 30, 2018, the Company purchased 49,561 shares of its common stock for approximately $745,397, at an average price of $15.04 per share.

180.    As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during the three month period ended June 30, 2018 was approximately $184,863.

181.    According to the 3Q18 10-Q, during the three month period ended September 30, 2018, the Company purchased 424,699 shares of its common stock for approximately $6.7 million, at an average price of $15.79 per share.

182.    As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during the three month period ended September 30, 2018 was approximately $1.9 million.

183.    According to the 2018 10-K, during October 2018, the Company purchased 7,198 shares of its common stock for approximately $97,964, at an average price of $13.61 per share.

184.    As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during October 2018 was approximately $16,555.

185.    According to the 2018 10-K, during November 2018, the Company purchased 1,363 shares of its common stock for approximately $18,945, at an average price of $13.90 per share.

186.    As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during November 2018 was approximately $3,530.

187.    According to the 1Q19 10-Q, during the three month period ended March 31, 2019, the Company purchased 29,977 shares of its common stock for approximately $385,204, at an average price of $12.85 per share.

188.    As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during the three month period ended March 31, 2019 was approximately $46,165.

189.    According to the 2Q19 10-Q, during April 2019, the Company purchased 900 shares of its common stock for approximately $11,241, at an average price of $12.49 per share.

190.    As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during April 2019 was approximately $1,062.

191.    According to Company's quarterly report on Form 10-Q filed with the SEC on November 12, 2019 (the "3Q19 10-Q"), during July 2019, the Company purchased 7,901 shares of its common stock for approximately $113,695, at an average price of $14.39 per share.

192.    As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during July 2019 was approximately $24,335.

193.   According to the 3Q19 10-Q, during August 2019, the Company purchased 440,054 shares of its common stock for approximately $5.97 million, at an average price of $13.57 per share.

194.   As the Company's stock was actually worth only $11.31 per share, the price at closing on August 9, 2019, the amount the Company overpaid for repurchases of its own stock during August 2019 was approximately $994,522.

195.   Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $6.48 million.

## DAMAGES TO MATTEL

196.   As a direct and proximate result of the Individual Defendants' and PwC's conduct, Mattel will lose and expend many millions of dollars.

197.   Such losses include over $6.48 million the Company overpaid when it repurchased its own common stock during the Relevant Period before the fraud was exposed at artificially inflated prices.

198.   Such losses also include any losses suffered in connection with the Company's termination of its $250 million Notes Offering.

199.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, its former CEO, its CFO, and its independent auditor, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

200.   These expenditures also include any fees associated with investigations by the SEC and other government/regulatory bodies relating to the whistleblower letter and the Company's internal investigation in connection thereto.

201.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

202.     Such expenditures further include costs associated with restating the 2018 10-K, and any other financial statements that need/needed revising.

203.     As a direct and proximate result of the Individual Defendants' and PwC's conduct, Mattel has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

204.     Plaintiff brings this action derivatively and for the benefit of Mattel to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Mattel, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

205.     Mattel is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

206.     Plaintiff is, and has continuously been since before the beginning of the Relevant Period, a shareholder of Mattel.  Plaintiff will adequately and fairly represent the interests of Mattel in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

207.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

208.     A pre-suit demand on the Board of Mattel is futile and, therefore, excused.  At the time of filing of this Amended Complaint, the Board consists of the following ten individuals: Defendants Kreiz, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu (the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten directors that were on the Board at the time of the filing of this Amended Complaint.

209.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to engage in improper accounting practices and to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they simultaneously caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

210.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to engage in improper accounting practices and in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, the Company repurchased its own stock at artificially inflated prices.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

211.    Additional reasons that demand on Defendant Kreiz is futile follow. Defendant Kreiz has served as the Company's Chairman and CEO since April 26, 2018, and as a Company director since June 13, 2017. Thus, as the Company admits, he is a non-independent director. He also serves as the sole member of the Company's Equity Grant Allocation Committee. The Company provides Defendant Kreiz with his principal occupation, and he receives handsome compensation, including $16,955,660 in 2018 for his services. Defendant Kreiz was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Kreiz is a defendant in one of the Securities Class Actions. For these reasons, Defendant Kreiz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Bradley is futile follow. Defendant Bradley has served as a Company director since May 17, 2018. He also serves as a member of the Audit Committee and Compensation Committee. Defendant Bradley has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and

consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bradley signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Bradley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Cisneros is futile follow. Defendant Cisneros has served as a Company director since August 13, 2018. She also serves as a member of the Governance and Social Responsibility Committee. Defendant Cisneros has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Cisneros signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Cisneros breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Dolan is futile follow. Defendant Dolan has served as the Board's Independent Lead Director since January 2015 and as a Company director since 2004.  He also serves as Chair of the Compensation Committee, Chair of the Executive Committee, and as a member of the Governance and Social Responsibility Committee. Defendant Dolan has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and

misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Dolan signed, and thus personally made the false and misleading statements in the October 2017 Form S-3, 2017 and 2018 10-Ks. For these reasons, Defendant Dolan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Laursen is futile follow. Defendant Laursen has served as a Company director since May 17, 2018.  He also serves as a member of the Governance and Social Responsibility Committee and the Compensation Committee. Defendant Laursen has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Laursen signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Laursen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.    Additional reasons that demand on Defendant Lewnes is futile follow. Defendant Lewnes has served as a Company director since 2015.  She also serves as Chair of the Governance and Social Responsibility Committee, and as a member of the Executive Committee. Defendant Lewnes has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to

cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Lewnes signed, and thus personally made the false and misleading statements in the October 2017 Form S-3, 2017 and 2018 10-Ks. For these reasons, Defendant Lewnes breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

217.    Additional reasons that demand on Defendant Lynch is futile follow. Defendant Lynch has served as a Company director since August 13, 2018.  He also serves as a member of the Audit Committee and the Finance Committee. Defendant Lynch has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lynch signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Lynch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Ng is futile follow. Defendant Ng has served as a Company director since 2006.  He also serves as the Chair of the Finance Committee, and as a member of the Audit Committee and the Executive Committee. Defendant Ng has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause

the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ng signed, and thus personally made the false and misleading statements in the October 2017 Form S-3, 2017 and 2018 10-Ks. For these reasons, Defendant Ng breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.   Additional reasons that demand on Defendant Olian is futile follow. Defendant Olian has served as a Company director since September 13, 2018.  She also serves as a member of the Compensation Committee and the Governance and Social Responsibility Committee. Defendant Olian has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Olian signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Olian breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

220.   Additional reasons that demand on Defendant Prabhu is futile follow. Defendant Prabhu has served as a Company director since 2007.  He also serves as Chair of the Audit Committee, and as a member of the Executive Committee and the Finance Committee. Defendant Prabhu has received and continues to receive compensation for his role as a director as described

above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Prabhu signed, and thus personally made the false and misleading statements in the October 2017 Form S-3, 2017 and 2018 10-Ks. For these reasons, Defendant Prabhu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

221.    Additional reasons that demand on the Board is futile follow.

222.    Each of the Directors, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $6.48 million for its own common stock during the Relevant Period. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases, particularly Defendants Lynch, Ng, Prabhu, and Laursen, who, as members of the Finance Committee oversaw the Company's repurchase programs. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

223.    Defendants Bradley, Lynch, Ng, and Prabhu (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the independence, qualifications, and performance of Mattel's independent auditor, and the Company's compliance

with legal and regulatory requirements. According to the 2019 Proxy Statement, the Audit Committee met 11 times during 2018 and were charged specifically with meeting with management and PwC to discuss and review the Company's financial statements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting practices and to issue false and misleading financial statements with the SEC for nearly two years. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

224.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants and PwC that preclude them from acting independently and in the best interests of the Company and the shareholders.  In fact, three of the Directors have served on the Board for nearly a decade or longer.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' and PwC's conduct. Thus, demand upon the Directors would be futile.

225.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.  In violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the "accuracy of company records, public reports and communications," and uphold the

responsibilities related thereto.  Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

226.    Mattel has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Mattel any part of the damages Mattel suffered and will continue to suffer thereby.  Thus, any demand upon the Directors would be futile.

227.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

228.    The acts complained of herein constitute violations of fiduciary duties owed by Mattel's officers and directors, and these acts are incapable of ratification.

229.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Mattel.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-

versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Mattel, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

230.     If there is no directors' and officers' liability insurance, then the Directors will not cause Mattel to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

231.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

232.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

234.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

235.    Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes Offering and restate certain of its financial statements.

236.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to issue false and misleading statements and/or omissions of material fact and to engage in higher spending promotional levels.

237.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and

omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, advisory approval of executive compensation, ratification of the Company's independent auditor, PwC, approval of a stockholder proposal to require an independent Chairman of the Board with respect to the 2018 Proxy Statement, approval of a stockholder proposal regarding an amendment to stockholder proxy access provisions with respect to the 2019 Proxy Statement, and approval of amendments to the 2010 Long-Term Compensation Plan.

238.    The false and misleading elements of the Proxy Statements led to the approval of the ratification of PwC as the Company's auditor, amendments to the 2010 Long-Term Compensation Plan and to the re-election of Defendants Kreiz, Georgiadis, Bradley, Cisneros, Dolan, Edwards, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu, which allowed them to continue breaching their fiduciary duties to Mattel.

239.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

240.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Mattel.  Not only is Mattel now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Mattel by the Individual

Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over 1.47 million of its own shares on the open market at artificially-inflated prices, damaging Mattel by hundreds of thousands of dollars.

243.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

244.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Mattel not misleading.

245.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Mattel.

246.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The

Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

247.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

248.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

249.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## <u>THIRD CLAIM</u>

**Against PwC for Violations of Section 10(b)
and Rule 10b-5 of the Securities Exchange Act of 1934**

250.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.    PwC participated in a scheme to defraud with the purpose and effect of defrauding Mattel.  Not only is Mattel now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Mattel by PwC.

252.    During the Relevant Period, PwC, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct designed to falsify the Company's periodic and current reports filed with the SEC.

253.    PwC employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Mattel not misleading.

254.    PwC is liable as a direct participant in the wrongs complained of herein.  Through its position as the Company's independent registered accounting firm, PwC was able to and did control the conduct complained of herein and the content of the "clean" audit reports contained in the financial statements disseminated by Mattel.

255.    PwC acted with scienter during the Relevant Period, in that PwC either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that PwC failed to ascertain and to disclose the true facts, even though such facts were available to PwC.  PwC worked with the top executives of the Company, and received direct briefings from them, and was therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

256.    By virtue of the foregoing, PwC has violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

257.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

258.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.    The Individual Defendants, by virtue of their positions with Mattel and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Mattel and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act.  The Individual Defendants had the power and influence and exercised the same to cause Mattel to engage in the illegal conduct and practices complained of herein.

260.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

261.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

262.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mattel's business and affairs.

263.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

264.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mattel.

265.    In breach of their fiduciary duties owed to Mattel, the Individual Defendants willfully or recklessly caused the Company to engage in improper accounting practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of

material fact that failed to disclose that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes Offering and restate certain of its financial statements.

266.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

267.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

268.    In yet further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company during the Relevant Period before the fraud was exposed to repurchase its own common stock at artificially inflated prices, such that it overpaid by more than $6.48 million.

269.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mattel's securities.

270.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mattel's securities.

271.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

272.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mattel has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

273.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Unjust Enrichment

274.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

275.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Mattel.

74

276.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Mattel that was tied to the performance or artificially inflated valuation of Mattel, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

277.    Plaintiff, as a shareholder and a representative of Mattel, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

278.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Abuse of Control

279.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

280.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Mattel, for which they are legally responsible.

281.    As a direct and proximate result of the Individual Defendants' abuse of control, Mattel has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Mattel has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

282.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## EIGTH CLAIM

### Against Individual Defendants for Gross Mismanagement

283.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Mattel in a manner consistent with the operations of a publicly-held corporation.

285.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Mattel has sustained and will continue to sustain significant damages.

286.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

287.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## NINTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

288.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

289.    The Individual Defendants caused the Company to engage in improper accounting practices, to repurchase its own stock at artificially inflated prices, and to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

290.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Mattel to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions,

to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

291.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

292.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## **TENTH CLAIM**

### **Against PwC for Aiding and Abetting Breaches of Fiduciary Duty and the Individual Defendants' Other Violations of Law**

293.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

294.    PwC aided and abetted the Individual Defendants who breached their fiduciary duties to Mattel, abused their control, grossly mismanaged the Company, wasted corporate assets, violated the Exchange Act, and were unjustly enriched thereby.

295.    PwC's misconduct resulted in continuous, connected, and ongoing harm to the Company.

296.    Specifically, PwC aided and abetted the Individual Defendants in making false and misleading statements about the Company's internal controls and the adequacy of the Company's financial statements, allowing the artificial inflation of the price of Company stock.

297.    PwC is jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws, including for any unjust enrichment PwC received from Mattel while it violated the Exchange Act and aided and abetted the Individual Defendants' aforementioned violations of law.

298.    As a direct and proximate result of PwC's aiding and abetting of Mattel's directors' and officers' breaches of duty and other misconduct alleged herein, Mattel has sustained and will continue to sustain substantial damages.

299.    Plaintiff on behalf of Mattel has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants and PwC as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Mattel, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Mattel;

(b)    Declaring that PwC has aided and abetted the Individual Defendants' breaches of their fiduciary duties to Mattel and other violations of law;

(c)    Determining and awarding to Mattel the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and PwC, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Mattel and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Mattel and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

78

guidelines of the board;

2. a provision to permit the shareholders of Mattel to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Mattel restitution from the Individual Defendants and PwC, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: April 16, 2020                          Respectfully submitted,

Of Counsel:                                    **FARNAN LLP**

**THE ROSEN LAW FIRM, P.A.**                   /s/ *Brian E. Farnan*
Phillip Kim                                    Brian E. Farnan (Bar No. 4089)
275 Madison Avenue, 40th Floor                 Michael J. Farnan (Bar No. 5165)
New York, NY 10016                             919 N. Market St., 12th Floor
Telephone: (212) 686-1060                      Wilmington, DE 19801
Facsimile: (212) 202-3827                      Telephone: (302) 777-0300
Email: pkim@rosenlegal.com                     Facsimile: (302) 777-0301
                                               Email: bfarnan@farnanlaw.com
**THE BROWN LAW FIRM, P.C.**                   mfarnan@farnanlaw.com
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net